COX, J.
The defendant, Nathaniel Allen Mingo ("Mingo"), was charged with second degree murder, in violation of La. R.S. 14:30.1, for the March 15, 2015, shooting of his girlfriend, Amanda Collins ("Collins"). Mingo filed a notice of intent to present a defense of intoxication pursuant to La. R.S. 14:15(2). The jury was instructed on the law of this defense, but ultimately found Mingo guilty as charged. A pro se motion for new trial was denied, and Mingo was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. Mingo now appeals. For the following reasons, we affirm his conviction and sentence.
FACTS
On March 14, 2015, Mingo and Collins were in Center, Texas, to attend a wedding. However, the couple chose not to attend the wedding and returned to Shreveport, where they went to the El Dorado Casino. Surveillance video of the casino's parking garage shows the couple entered the garage in a red Ford pickup truck at approximately 11:30 p.m. The couple then entered the casino and do not appear on the video again until 3:26 a.m. on March 15, 2015.
At 3:37 a.m., the video shows Mingo and Collins engaged in a verbal altercation in the elevator. Mingo can be seen hitting Collins in the face prior to this altercation, as shown by the video. Two minutes later, Collins gets into an elevator alone and appears to be crying. She appears intoxicated.
At 4:28 a.m., the couple are seen getting into a white vehicle with two individuals. They are next seen getting out of the vehicle and into the red truck, which is *633 shown exiting the garage at 4:33 a.m. The events that transpired upon leaving the casino were provided to the police by Mingo following his arrest.
Mingo told officers that he and Collins had eaten dinner and been to a bar shooting tequila that night. He also claimed to have taken two Xanax pills provided to him by Collins. He insisted he did not remember the details of the shooting, but maintained it was an accident. Mingo told officers he and Collins were driving to a hotel by Louisiana Downs and were talking about the fact that several people owed him money for drugs. Mingo stated he was "joking" about what he was going to do to those people to get his money, when he asked Collins if "there was one in the chamber" of his 9mm pistol. According to Mingo, she said there was not. Mingo then picked up the gun and pointed it at Collins, saying "this is what I'm gonna do" to people who owed him money. Mingo then pulled the trigger, shooting Collins in the left side of her neck and blowing out the passenger's side backseat window.
After shooting Collins, Mingo drove to his grandmother's home and told his grandmother and aunt what he had done. Mingo stated he was told to leave the property because he had killed someone. He then claimed he went to his uncle's home near Goathill Road in Bossier Parish, where he drove into a field and the truck became stuck. At that point, Mingo stated he called someone to come get him and take him to the hotel at Louisiana Downs. Mingo admitted returning to the field at some point that morning, seeing the police present, and leaving.
When the truck was found by the police, Collins was deceased in the front seat, and there were a large barrel and chainsaw in the bed of the truck. The backseat of the truck was packed with the couple's belongings, and Collins' purse was also in the truck.
When Mingo was located by the police, he had been driving a white sedan in which two boxes of large trash bags were found with a Dollar Store receipt from the early morning hours of March 15, 2015. In his statement, Mingo claimed the barrel and chainsaw were already in his truck, and the trash bags were for his lawn business.[1] He also told officers that the gun belonged to Collins. He further claimed he did not know much about guns and was not a violent person. When questioned about his actions after shooting Collins, Mingo stated he was scared and did not know what to do because he had never done anything like this before and could not believe he had shot and killed her. Finally, Mingo stated he only takes Xanax and smokes marijuana, but does not do drugs because it "alters people's minds."
At trial, Danielle Arrindell, a woman who was on the elevator at the El Dorado Casino with the couple, testified that Mingo pushed Collins, and the two seemed to be arguing. She stated that "after he pushed her he said something about being a gangster... he showed himself to the rest of us in the elevator." Arrindell described Mingo as "puffing his chest out, turning around to make sure we were all looking at his face." She did not recall Collins saying anything other than "baby, don't be that way." Arrindell testified that she was shaken up by Mingo's hostile behavior, but she did not notice any bruising on Collins' face.
Theodore Green, the driver of the white vehicle noted earlier, testified that he encountered the couple in the El Dorado parking garage. He stated that he offered *634 to take the couple to find their vehicle in the garage. Mingo and Collins sat in the backseat. According to Green, Mingo was upset with Collins. He stated Mingo "was pretty intoxicated" and should not have been driving, but also stated Mingo knew what he was doing. Upon finding the truck, Mingo and Collins exited Green's vehicle, and Mingo told Green he "should just leave [Collins] with y'all."
Frank Peretti, an expert in forensic pathology, confirmed Collins was killed by a single, close-range gunshot wound to the neck. Photographs of Collins' neck and face, showing the entry wound and predeath bruising to her mouth area, were introduced as evidence. Dr. Peretti testified that Collins' blood alcohol content was .149 at the time of the autopsy, and the toxicology revealed she had recently ingested methamphetamine.
Sergeant Chad Madden of the Bossier Parish Sheriff's Office ("BPSO") testified that he responded to the scene where Mingo's truck was found. He described the scene and also stated he called Collins' former mother-in-law and spoke to her husband, who gave him Mingo's name. Mingo's videotaped interview was introduced and played for the jury after Madden's testimony.
Lieutenant Shannon Mack of the BPSO was dispatched to the scene and testified that she located Mingo the following morning by tracking his cellphone to the Holiday Inn Financial Plaza in Shreveport. She testified Mingo was taken into custody after a struggle. Mingo was in possession of a 9mm handgun, $11,236 in cash, Collins' I.D. card, and two cellphones. Lieutenant Mack further testified that a search of the Marriott hotel room by Louisiana Downs where Mingo had been staying produced a briefcase containing a "tap code magazine" and ammunition. The magazine was for a "7.62 round or AK47 rifle." The gun, photographs of the two boxes of trash bags, and the Dollar Store receipt were introduced into evidence.
Officer John Madjerick of the Shreveport Police Department's Crime Scene Investigations Unit testified that he responded to Financial Plaza in Shreveport where Mingo was apprehended. He stated that he located a handgun on the ground near where Mingo was first seen and a Crown Royal bag containing $12,400 on the ground near the gun. Detective Becky Fohl of the BPSO's Crime Scene Investigations Unit corroborated the findings and investigation of the scene where the truck was located.
Lieutenant Jonathon Jackson of the BPSO testified that he was in charge of the property room where the evidence in Mingo's case was stored. Lieutenant Jackson identified the handgun, along with items found in the white Charger, a white T-shirt with blood stains on the sleeve, the chainsaw and sharpening tool for the chainsaw, and a 9mm magazine and holster found under the driver's seat of the red truck. On cross-examination, he noted there were also three beer cans along with various pills and medications in the truck.
Clarence McCoy testified he saw Mingo the morning of the shooting. McCoy was staying at a Shreveport hotel with Marcus Monroe. He accompanied Monroe to Mingo's aunt's home on Goathill Road that morning. The two met Mingo in the driveway around 7:00 or 8:00 a.m. Mingo was driving a "burgundy Ford super duty truck." McCoy testified that Monroe got out of the vehicle and spoke to Mingo. McCoy remained in the vehicle, but stated he could hear some of the conversation. According to McCoy, Mingo "said I fucked up. He said-he asked Marcus where can he take the truck to and asked him about a chainsaw." McCoy stated he did not know what Mingo was talking about at the time *635 or hear anything else that was said. He stated Mingo and Monroe prayed together and hugged.
McCoy and Monroe then went to Monroe's aunt's home about one half mile away. McCoy testified that Mingo arrived in a white Charger. He stated he spoke to Mingo, who had a black handgun, but could not recall what was said. McCoy testified that he then went home and walked to Four Corners store. While walking, he saw the officers in the field and recognized the "burgundy Ford super duty" truck as the one Mingo had been driving early that morning. McCoy stated that when he got to the store, he saw Mingo and another man drive up in a white pickup truck. Mingo offered to give McCoy a ride home, and McCoy accepted. McCoy testified that Mingo had blood on his shirt and hand that morning. He stated he did not call police because he was scared of Mingo. Further, he responded "no" when asked if he had any reason to believe Mingo was intoxicated. McCoy testified this was the last time he saw Mingo.
Bernadine Collins, who lives on Goathill Road, testified that Mingo drove the red truck to her home the morning of the murder, but she made him leave because the person with Mingo was dressed in all red indicating affiliation with a local gang.
The state next called Jacquelyn Maddox, the girlfriend of Mark Villareal. Maddox was staying the night at Villareal's home in Haughton when she and Villareal were awakened by a tapping on their window in the early morning hours of March 14, 2015. The man outside was dressed up, but appeared dirty. She did not see his vehicle. Villareal met the man at the front door. While Maddox could not hear the conversation, she stated she could hear sobbing. Maddox watched the man and Villareal walk to the shed and carport area. She then saw the dark red truck driven by the man with a "metal barrel" that looked like a deer feeder in the bed of the truck. As Mingo drove away, she noticed the back passenger side window was "down."
Carla White, a firearms examiner at the Northwest Louisiana Crime Lab, identified the handgun used to shoot Collins as a Springfield 9mm pistol. She explained it was unlikely that the gun could fire without a finger on the trigger pulling eight pounds of pressure. In other words, she opined that it was highly unlikely that the gun could be unintentionally or accidentally fired. White noted that the gun has a feature on the slide that indicates whether there is a bullet in the chamber. According to White, only if the slide alert was broken could the firing of the gun be accidental.
Michelle Vrana, DNA Section Supervisor at the Northwest Louisiana Crime Lab, testified that the blood on the white dress shirt and handkerchief belonging to Mingo was a mixture of Mingo's and Collins' blood. The beer can found in the cup holder of the truck revealed only Collins' DNA. Analysis of the 9mm handgun revealed several indicators that Mingo was a major contributor to the DNA found on the gun.
Mingo was found guilty as charged and sentenced to life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence.
On appeal, Mingo sets forth three assignments of error. First, Mingo argues that he presented sufficient evidence of intoxication to preclude a finding of the requisite specific intent. Next, Mingo argues he was denied his right to self-representation. Finally, Mingo argues he was denied his voir dire rights.
DISCUSSION
Sufficiency of the Evidence/Intoxication
The standard of appellate review for a sufficiency of the evidence claim is whether, *636 after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Apodaca , 50,113 (La. App. 2 Cir. 9/30/15), 180 So.3d 465. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Sullivan , 51,180 (La. App. 2 Cir. 2/15/17), 216 So.3d 175.
The appellate court does not assess the credibility of the witnesses or reweigh evidence. State v. Dale , 50,195 (La. App. 2 Cir. 11/18/15), 180 So.3d 528, writ denied , 2015-2291 (La. 4/4/16), 190 So.3d 1203. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Randle , 49,952 (La. App. 2 Cir. 6/24/15), 166 So.3d 465 ; State v. Casaday , 49,679 (La. App. 2 Cir. 2/27/15), 162 So.3d 578, writ denied , 15-0607 (La. 2/5/16), 186 So.3d 1162.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; State v. Sullivan , 51,180 (La. App. 2 Cir. 2/15/17), 216 So.3d 175.
Second degree murder is defined in La. R.S. 14:30.1, which provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. State v. Christopher , 50,943 (La. App. 2 Cir. 11/16/16), 209 So.3d 255. Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. State v. Murray , 49,418 (La. App. 2 Cir. 1/14/15), 161 So.3d 918, writ denied , 2015-0379 (La. 4/8/16), 191 So.3d 582.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome , 49,004 (La. App. 2 Cir. 4/9/14), 136 So.3d 979, writ denied , 14-0990 (La. 1/16/15), 157 So.3d 1127. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Broome, supra.
Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Leone , 48,892 (La. App. 2 Cir. 5/15/14), 140 So.3d 793, 801, writ denied sub nom. State ex rel. Leone v. State , 2014-1337 (La. 4/10/15), 163 So.3d 804. Further, the discharge of a firearm at close range and *637 aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. Id. Other circumstances which may support an inference in such cases are evidence of flight to avoid apprehension and a previous acrimonious relationship between the shooter and the victim. State v. Christopher, supra .
Voluntary intoxication will not excuse a crime, but is a defense to a specific intent offense if the circumstances demonstrate that intoxication precluded formation of the requisite intent. La. R.S. 14:15(2) ; State v. Mickelson , 12-2539 (La. 9/3/14), 149 So.3d 178, 183 ; State v. Apodaca, supra . The defendant has the burden of proving his intoxication defense. Thereafter, it falls to the state to negate that defense by showing beyond a reasonable doubt that specific intent was present, despite the defendant's alleged intoxication. State v. Apodaca, supra . Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact. Id.
While it is clear that Mingo consumed alcohol and Xanax on the night of the crime, merely doing so is insufficient to meet the preponderance of the evidence burden required to prove the affirmative defense of intoxication. Contrary to Mingo's claim that his intoxication was so severe as to preclude the formation of specific intent, the evidence showed Mingo still had the ability to reason and make decisions.
Mingo's statement to the police that he had been shooting tequila and had taken two Xanax pills tends to support his intoxication. He told the officers that Xanax made him forget things. However, Green's testimony showed that Mingo knew what he was doing despite allegedly being intoxicated when he left the casino. Further, Monroe testified that he saw no reason to believe Mingo was intoxicated on the morning of the murder. Most importantly, however, were Mingo's actions in devising a plan to get a barrel and chainsaw, as well as his willingness to tell his grandmother and others what he had done. These actions indicate his ability to reason and make decisions.
Mingo's actions were not those of a person who was so highly intoxicated that he did not know what he was doing or what had happened. Instead, the evidence showed that Mingo was upset with Collins, and the two were arguing prior to the shooting. The autopsy, photographs, and testimony established that there was bruising inflicted to Collins' lips before her death. Furthermore, Mingo was completely aware that he killed Collins and even devised a plan to dispose of her body, which was derailed when his truck became stuck in the field. Throughout his efforts to cover up the shooting, Mingo freely told others what he had done. The attempted cover-up is evidence of a guilty conscience.
Despite evidence of Collins' high blood alcohol content level, Mingo never provided any evidence at trial of his own intoxication. It should also be noted that Mingo did not stop, pull over, try to stop the bleeding, or attempt to administer CPR after shooting Collins. Instead, he kept driving. The evidence was thus sufficient to allow the jury to reject the defense of intoxication and find that the state negated that defense by proof beyond a reasonable doubt. Viewing the evidence as a whole in the light most favorable to the prosecution, the jury could have reasonably found the elements of second degree murder were proven beyond a reasonable doubt.
Right to Self-Representation
Minutes before jury selection began on November 14, 2016, Mingo repeatedly attempted *638 to address the trial court and make oral pro se motions and arguments. The trial court admonished Mingo that he did not represent himself, but had two appointed attorneys as counsel. The trial court advised Mingo's defense counsel to "get your client under control" and advised Mingo that if he desired to have motions made, he should instruct his counsel and let counsel address the court. Mingo responded, "Well if that's the case, Your Honor, with all due respect I would like to withdraw from counsel and represent myself." Initially the motion was denied. However, following a bench conference, court reconvened and a Faretta hearing was held.[2]
The trial court denied Mingo's motion for the following reasons: (1) the last-minute timing of the motion and the belief that it was a delay tactic; (2) Mingo's admitted mental problems, including his past diagnosis of bipolar disorder and his recent treatment for anxiety in jail; (3) Mingo's medication for anxiety was recently stopped; (4) Mingo's limited formal education of 10th grade and GED; and, (5) Mingo's inability to express a meaningful understanding of the charge of second degree murder. After the ruling, Mingo had to be removed from the courtroom and placed in belt restraints due to his disruptive behavior.
Mingo argues he was denied his right to self-representation and that his responses to questioning indicated his choice was intelligently and voluntarily made. He believes the assertion of his right was clear and unequivocal.
Amendments VI and XIV of the United States Constitution, as well as Louisiana Constitution Article I, § 13, guarantee the accused in a criminal proceeding the right to assistance of counsel for his defense. Gideon v. Wainwright , 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) ; State v. Carpenter , 390 So.2d 1296 (La. 1980) ; State v. Johnson , 50,234 (La. App. 2 Cir. 11/18/15), 182 So.3d 1039, writ denied , 15-2242 (La. 3/24/16), 190 So.3d 1190.
An accused has the right to choose between the right to counsel and the right to self-representation. Requests which vacillate between self-representation and representation by counsel are equivocal. State v. Strain , 585 So.2d 540 (La. 1991) ; State v. Johnson, supra.
The right to counsel may be waived, but the accused must know of the right and intentionally relinquish it. Faretta v. California , supra. A waiver of counsel, in order that an accused may enter into pro se representation, must be clear and unequivocal. Id. ; State v. Johnson, supra . In order to be valid, a waiver of the right to counsel by a defendant must be made knowingly, understandingly, and intelligently. State v. Conner , 49,351 (La. App. 2 Cir. 11/19/14), 152 So.3d 209. Although a defendant need not himself have the skill and experience of a lawyer in order to competently and intelligently choose self-representation, he should be made aware of the dangers and disadvantages of self-representation so that the record will establish that "he knows what he is doing and his choice is made with eyes open." Faretta, supra , citing Adams v. United States , 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). Courts must indulge in every reasonable presumption against a waiver of counsel. Faretta, supra ; State v. Johnson, supra.
Although a defendant should be made aware of the dangers and disadvantages of self-representation, there is no particular formula which must be followed *639 by the trial court in determining whether the defendant has waived his right to counsel. State v. Carpenter, supra ; State v. Johnson, supra . The determination of whether a defendant knowingly and voluntarily waived his right to counsel depends on the facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. State v. Harper , 381 So.2d 468 (La. 1980) ; State v. Conner, supra. A more thorough inquiry is required to allow a defendant to represent himself at a felony trial than is required to accept his uncounseled guilty plea to an uncomplicated misdemeanor. State v. Johnson, supra . In State v. Strain, supra , the Louisiana Supreme Court stated:
The judge, in accepting a waiver of counsel at trial, should advise the accused of the nature of the charges and the penalty range, should inquire into the accused's age, education and mental condition, and should determine according to the totality of the circumstances whether the accused understands the significance of the waiver.
A jury trial commences when the first prospective juror is called for examination. La. C. Cr. P. art. 761. A defendant who waits until after the commencement of trial to assert for the first time his right to represent himself, after having acquiesced in representation by an attorney through pretrial procedures and the institution of trial, cannot thereafter successfully assert that right unless he makes a showing that the prejudice to his legitimate interests overbalances the potential disruption of the proceeding already in progress. State v. Hegwood , 345 So.2d 1179 (La. 1977) ; State v. Johnson, supra.
Once the trial date has arrived, the question of withdrawal of counsel rests with the discretion of the trial court, and the court's ruling will not be disturbed in the absence of a clear showing of an abuse of discretion. State v. Seiss , 428 So.2d 444, 447 (La. 1983) ; State v. Johnson, supra . Generally, a defendant's request to represent himself may be properly denied if the defendant makes such a request for the first time immediately prior to trial. State v. Hegwood, supra.
An inappropriate denial of the right to self-representation is not subject to harmless error analysis. Rather, it is a structural error that requires automatic reversal. McKaskle v. Wiggins , 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ; State v. Johnson, supra.
Mingo's assertion of his right to self-representation was made on the first day of trial, just minutes before the commencement of voir dire . The ruling on his motion was within the discretion of the trial court, and the motion was properly denied. In addition to the last-minute timing of the motion, the answers provided by Mingo during the Faretta hearing support the denial of his motion. Mingo admitted he experienced mental problems, including bipolar disorder and anxiety. He stated, "I'm having some issues as far as mental goes and me be able to proceed [sic ] things... I don't know what's happened and I'm not getting-I haven't been to the neurologist yet, but I have an appointment." Mingo also stated he had quit taking his anxiety medications the day before trial.
When asked about his understanding of the nature of the charge of second degree murder, Mingo explained:
Well second degree murder is-is basically defined as like if-if you had general intent or transfer intent in committing a crime or if you actually had any premed-well it's not premeditation, it's without the thought of premeditativeness I believe.
*640 Mingo understood that the penalty for second degree murder was life imprisonment, without the benefit of probation, parole, or suspension of sentence.
The trial court provided thorough and thoughtful reasoning for denying Mingo's motion for self-representation. The ruling was not an abuse of discretion.
Denial of Voir Dire Rights
Throughout the proceedings, Mingo filed many pro se motions, some of which the trial court allowed him to argue and some of which the trial court ruled on. One motion for voir dire was filed on the day of trial. After questioning, it was determined that Mingo was seeking to question the prospective jurors himself in addition to, or possibly instead of, his counsel.
In light of the denial of Mingo's motion for self-representation, the trial court explained that Mingo was not the proper party to question the jurors. The trial court explained at length the process in which Mingo could consult with his counsel regarding his concerns about potential jurors, which his counsel would then address with the court. Accordingly, the trial court found the motion to be moot because Mingo was afforded his full voir dire rights under the Constitution.
Mingo presents little argument on this issue, but appears to advocate for individual voir dire with questioning of prospective jurors done outside the presence of the remaining jury venire. This argument is blended with his challenge to the denial of his motion to self-represent. In sum, there is no support based on the evidence or law for these arguments. Mingo was afforded his full voir dire rights, and there is no requirement for individual voir dire .
CONCLUSION
For the foregoing reasons, Mingo's conviction and sentence are affirmed. Mingo's assignments of error regarding his right to self-representation and denial of voir dire rights are without merit. There was sufficient evidence such that the jury unanimously found him guilty as charged.
AFFIRMED.

Surveillance video of the truck entering the casino garage at 11:30 p.m. on March 14, 2015, and leaving the garage at 4:33 a.m. on March 15, 2015, show an empty truck bed.

Faretta v. California , 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).