Judgment rendered January 15, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,189-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

WILLIE DEWAYNE LYNN                         Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 338131

Honorable Katherine C. Dorroh, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Douglas L. Harville

JAMES E. STEWART, SR.                  Counsel for Appellee
District Attorney

TRENEISHA J. HILL
CHARLES K. PARR
JASON W. WALTMAN
Assistant District Attorneys

* * * * *

Before WILLIAMS, PITMAN, and STONE, JJ.

**WILLIAMS, C.J.**

The defendant, Willie Dewayne Lynn, was charged by bill of information with attempted second degree murder, a violation of La. R.S. 14:30.1 and La. R.S. 14:27. Following a jury trial, he was found guilty as charged. He was sentenced to serve 35 years at hard labor without the benefit of parole, probation or suspension of sentence. For the following reasons, we affirm.

### FACTS

In 2016, the defendant, Willie Dewayne Lynn, was involved in a romantic relationship with Alexis Arkansas, and they were living together in an apartment on Bernstein Avenue in Shreveport, Louisiana. The defendant and Alexis had been introduced to each other by Dave Delaney ("the victim"), who was the defendant's best friend and Alexis's cousin.

On January 24, 2016, the defendant and Alexis had a physical altercation, which led to a physical altercation between the defendant and the victim. During the clash, the defendant struck the victim multiple times with a metal rod or pole. As a result of the altercation, the victim sustained severe injuries to his head, suffers left-sided paralysis and is permanently disabled.

During the defendant's trial, Alexis testified as follows: on January 24, 2016, she was having a party at her apartment to celebrate her birthday; she invited the victim and her friends, Rose Hunter and Jameshia Allen; at approximately 10:15 p.m., the defendant called her on the telephone, and they began to argue; she ended the telephone conversation; approximately 15 minutes later, the defendant came to the apartment, and they became embroiled in a physical altercation; by this time, the victim had gone

outside; Rose and Jameshia were sitting on the sofa watching the altercation; she and the defendant exchanged "punches"; during the "scuffle," she and the defendant ended up on the balcony overlooking the parking lot of the apartment complex; she saw the victim in the parking lot and called down to him for help; the victim admonished them about fighting and told them to "cut this bullsh*t out"; the defendant and the victim began arguing; the defendant went downstairs and he and the victim "got to fist fighting"; she watched the fight between the two men from the balcony of her apartment; the victim struck the defendant with a padlock; the defendant told the victim, "Hold up, I got something for you"; the defendant reentered the apartment, put on his shoes, went back downstairs, and retrieved a "pole" from the bed of his pickup truck; meanwhile, the victim remained in the parking lot yelling at the defendant; the defendant began swinging the pole at the victim; the victim tripped and fell to the ground, and the defendant began hitting the victim with the pole; the defendant struck the victim "three or four" times while the victim lay on the ground; from her vantage point on the balcony, it looked as if the defendant had struck the victim on the legs;[1] she noticed that the victim was not kicking or trying to get up from the ground; she went downstairs and observed that the victim was lying on the ground bleeding from his head; the victim's head was "in a puddle of blood"; the defendant then chased her with the pole in his hand; she ran into her apartment and locked the door; and the defendant "kicked down" the

---

[1] We note that the victim's medical records did not reveal any injuries to his legs. According to the medical records, all of the injuries the victim sustained were to his face and head.

door, entered the apartment to search "for something," then left the apartment.

Alexis was then questioned regarding the statement she provided to police officers on the night of the incident. An audio recording of Alexis's statement was played to refresh her recollection. Thereafter, Alexis testified that she recalled telling a detective that after the defendant beat the victim, he chased her back to her apartment and kicked down the door; while in the apartment with her, the defendant stated, "I'll kill you, too." Nevertheless, during her testimony at trial, Alexis denied the truthfulness of her initial statement to the detective. She testified that the defendant did not make that statement to her and claimed that she was intoxicated on the night of the incident. Additionally, Alexis testified that she and the defendant spoke on the telephone every day after his arrest, and that she had spoken to him the day before she testified. According to Alexis, she and the defendant continued to be "in a relationship."

Rose Hunter testified as follows: she was a friend of Alexis and the former girlfriend of the victim; she was at the apartment Alexis shared with the defendant on the night of the incident; she heard Alexis and the defendant arguing and "cussing" on the telephone; Alexis hung up on the defendant, and he entered the apartment, hit a beer bottle on the table, and asked Alexis, "B*tch, what I told you about playing with me on the phone?"; Alexis and the defendant began physically fighting; the victim was in the parking lot "fixing a drink"; the victim and the defendant "exchanged words" while the defendant and Alexis were fighting on the balcony; when the victim pulled out a padlock, the defendant stated, "Hold up," briefly reentered the apartment, then went to his truck; the defendant armed himself

3

with a "large rod" that he retrieved from the bed of his truck; the rod was approximately 2½ to 3 feet long; the victim had a reputation for keeping a padlock on his person to use as a weapon when fighting; both men began "swinging" at each other; the victim "busted" the defendant's lip and walked away; the defendant hit the victim "upside the head" with the pole and the victim "went down"; the defendant repeatedly struck the victim in the head with the pole after he fell to the ground; the victim never got back up; "after [the defendant] hit [the victim] one time, [the victim] went down [and] did not try to get up"; the victim "was not trying to do anything else[;] [the defendant] just constantly was hitting him while he was down"; the defendant struck the victim in the head and on his legs with the pole "five or six times; the victim had a "gashed head with blood everywhere"; she ran down the stairs to the parking lot to check on the victim; the defendant ran back upstairs to the apartment, "busted down the door," and then returned to the parking lot and struck the victim "several more times"; she observed the victim lying in "bubbling blood" and gasping; and the defendant fled when they heard sirens approaching.

On cross-examination, Rose admitted that on the night of the incident, she told the detectives that the defendant was defending himself against the victim, who was armed with a padlock. During her testimony on redirect examination, Rose explained that the victim put his hand in his pocket (as if to retrieve the padlock), but he did not advance toward the defendant, and no "licks" had been exchanged at that point. According to Rose, the defendant returned to the apartment then proceeded to his truck to arm himself with the pole. She stated that during this time, the victim was standing in the same

4

place.  Further, Rose affirmed that the defendant continued to beat the victim in the head with the pole after the victim fell to the ground.

Jameshia Allen, the victim's godsister also testified.[2]  During her testimony, she described the telephone argument and physical altercation between the defendant and Alexis.  Jameshia further testified as follows:  she did not intervene in the fight between the couple because "they [are] going to get back together in the end"; once the fighting extended to the balcony, the victim yelled for them to get back inside so the police would not be called; that was when the defendant "snapped" and went downstairs to "face up" with the victim; when the defendant was "faced up" with the victim, the defendant stated, "[W]ell, I got something for you"; she did not see any "blows thrown" at that point; the defendant ran back upstairs and she thought he may be getting a gun; however, the defendant exited the apartment without a weapon and went to his truck; she could not see what the defendant retrieved from the bed of the truck; the victim was still standing in the parking lot when the defendant began swinging at him; the defendant "just repeatedly beat – was beating [the victim] in the head"; once the defendant struck the victim, he fell to the ground "on his stomach"; the defendant continued to beat him in the head; she ran downstairs to see if the victim was alive; the victim was "choking on his own blood" while he was on the ground being hit; she could hear the victim "making bubbles" and trying to gasp for air; the defendant "smashed" the victim's cell phone and then "disappeared"; she did not see the victim hit the defendant; she never

_____

[2] During her testimony, Jameshia sometimes referred to Alexis as "Neenee" and to the defendant as "Gator."

saw the victim approach the defendant; and the victim stood in the same place throughout the incident and did not follow the defendant to his truck.

On cross-examination, Jameshia denied knowing that the victim carried a padlock for protection. She also denied seeing the victim with a padlock on the night of the incident.[3]

Dewayne Watkins, a resident of the apartment complex on the night of the offense,[4] testified as follows: he heard a commotion in the parking lot of his apartment; he walked outside and saw the defendant and the victim;[5] the defendant went upstairs to his apartment and the victim was standing in the parking lot "with something in his hand"; the victim was "squaring up to" the defendant; the victim hit the defendant, then the defendant "ran and jumped" onto the bed of his truck; the victim was "going up behind" the defendant; the defendant jumped off the truck with a pole and began swinging it at the victim; the defendant struck the victim in the face with the pole and the victim fell to the ground; and he did not see the defendant continue to swing the pole after the victim fell.

Initially, Watkins testified that he thought the victim was kicking and trying to get up. However, he later stated that the defendant hit the victim "two or three" times in the "arm and across his face" after he was on the ground. Watkins stated that he did not know how long the "beating" lasted.

---

[3] A padlock was recovered from the scene. The padlock and two color photographs of the padlock were admitted into evidence at trial.

[4] At the time of the defendant's trial, Watkins was incarcerated at Caddo Correctional Center on pending charges unrelated to the incident involving the defendant and the victim.

[5] During his testimony, Watkins referred to the victim as "Mr. Darrell."

According to Watkins, the defendant "just stopped" and "took off somewhere."

During his cross-examination, Watkins maintained that he saw the victim "throw the first blow," describing "quick movements." He also admitted that he is legally blind in one eye and that his "eyes are kind of bad." Nevertheless, Watkins testified that he saw a "shiny" object in the victim's hand when the victim hit the defendant. He stated that he attempted to keep the men from fighting, but he ultimately "backed off" because he did not want to get hit. When asked if he saw the victim follow the defendant to his truck, Watkins reiterated that the victim did so.

Officer Carlos Glass-Bradley, of the Shreveport Police Department ("SPD"), testified as follows: he was a patrol officer working the graveyard shift on the night of the offense; he responded to the call and initially began pursuit of a red vehicle that had been broadcast as a possible suspect vehicle leaving the apartment complex; he went to the apartment complex after he learned that the vehicle he was pursuing was not involved in the incident; he saw a black male running between the buildings and began chasing the man on foot; during the chase, a citizen stopped him and directed him to where the victim was lying in the parking lot; he observed that the victim's head was "smashed in" and he had "thick blood" coming from his nose, ears and eyes; there was also "thick, almost brain matter" oozing from the victim's ears;[6] he and other law enforcement officers rolled the victim to his side because he appeared to be "drowning in his own blood"; while transporting a witness to the police station, he heard several radio dispatch messages

_____

[6] The victim's emergency room records reveal that he arrived at the hospital with "brain matter in [his] right external [ear] canal" and in his "right [nostril.]"

7

indicating that the suspect had been taken into custody after he was seen climbing from a garbage dumpster; he observed the defendant in the back of a patrol car at the police station; the defendant did not appear to be injured or in need of medical attention; and the person he saw in the back of the police car was the same person he had been chasing earlier.

Corporal Jason Allgrunn of the SPD was also working the graveyard shift on the night of the offense. He testified as follows: he responded to the call and "set up a perimeter" at the apartment complex; he transported the defendant to the police station; the defendant did not require assistance in walking; he observed "maybe a little spot of blood" on the defendant's left upper lip; after they arrived at the police station, the defendant stated that he had asthma and that he had been hit with a padlock; the defendant was transported to the hospital because he had stated that he had asthma; and the defendant denied needing medical attention after he arrived at the hospital.

Officer Niakia Channell, a patrol officer with the SPD, also responded to the scene. She testified as follows: she observed blood and brain matter on the parking lot of the apartment complex; she initially thought the victim was deceased, but she could see "bubbles" in the blood; she got down on her knees and could hear the victim breathing; she went to University Health to assist the other police officers; she escorted the defendant into the building from another officer's patrol car; the defendant did not need assistance walking; and she did not observe any noticeable injuries on the defendant.

Corporal Derrick Barker, another patrol officer for the SPD, also testified that he responded to the call and went to the scene. Cpl. Barker corroborated the testimony of other witnesses with regard to the victim's condition at the scene. Cpl. Barker further testified that he observed a "tiny

8

drop of milky looking blood" on a step that he opined had "been spit" there. He also observed a "bright red" blood drop approximately 15 feet away from the scene that appeared to have "fallen from something," *i.e.*, it was not cast.

Photographs of the crime scene were introduced during the testimony of Detective Marcus Mitchell, a crime scene investigator with the SPD. The photographs depicted the following items: a set of keys, a combination padlock, a broken cell phone, and a jack without the pole (seen in the bed of the defendant's truck).[7] Photographs of the blood spots, about which Cpl. Barker had testified, were also introduced into evidence. On cross-examination, Det. Mitchell agreed that he could not confirm whether there was blood on the padlock, and he testified that he did not recall seeing blood spots on the padlock. When asked why the photograph of the padlock was in black and white, while the other photographs were in color, Det. Mitchell replied that he had no knowledge whether the photograph was in black and white, or just of poor quality.

The state recalled Dewayne Watkins. A portion of the audio and video recorded statement Watkins made to detectives on the night of the offense was played for the jury. On the recording, Watkins stated that he did not see the victim with a weapon and that the defendant "was steady swinging" trying "to get to" the victim. On cross-examination, Watkins stated that he was never asked about a "shiny object," as opposed to a "weapon." He also testified that the victim "was after" the defendant before the two men began fighting. On redirect, Watkins attempted to explain his varying statements to detectives as follows: "On my interview, excuse me,

---

[7] The pole was never recovered.

but I was on drugs myself as in being on mojo and all types of different drugs[.]"

Officer Darrien Jackson, a patrol officer with the SPD, testified at trial as follows: on the night of the offense, he was working "extra duty" at the Bernstein apartment complex as a "courtesy patrol officer"; in that capacity, he wore his full SPD uniform, but he was employed by the apartment complex as a security guard; after the offense, he searched the apartment complex for a suspect for approximately 30 to 45 minutes; he observed the defendant climbing out of the garbage dumpster; the defendant fled on foot; he chased, apprehended and handcuffed the defendant, who was not injured and had no trouble walking or running; and he released the defendant to Ofc. Glass-Bradley, who transported him to the police station.

Detective Joshua Mayfield, with the SPD Violent Crimes Unit, testified and corroborated the testimony with regard to the crime scene and the condition of the victim. Det. Mayfield further testified as follows: he interviewed Alexis after the offense and confirmed that she stated that the defendant told her, "I'll kill you, too"; Alexis had "knots" on her forehead and swelling to her head; Alexis "was emotional" during her interview, but she was forthcoming with information that was consistent with the evidence recovered from the scene; Alexis's demeanor at trial seemed "reluctant" and "defensive"; and during his interview with Watkins on the night of the incident, Watkins stated that the victim was not armed and that the defendant was "chasing" the victim.

Tina Harper, the victim's sister, also testified at the defendant's trial. She testified as follows: at around midnight on January 24, 2016, she was notified that her brother was in the hospital and was "dying or dead"; she

immediately went to the hospital, where she was met with other family members who had already arrived; the victim was hospitalized until April 2016; he was in ICU/Neuro ICU for approximately two months before being moved to a "regular" hospital room. Tina also described the victim's course of medical treatment, including two surgeries, the insertion of a PEG tube, tracheostomy, and a severe infection of his head wound. According to Tina, during the victim's hospitalization, intracranial pressure caused his head to "explode all on the back of the wall of his – where his bed was." She also testified that she and her family searched for "weeks" for a rehabilitation facility willing to accept the victim as a patient. Ultimately, once the victim's tracheostomy was removed, Christus Schumpert agreed to accept him and provide inpatient rehabilitation.

Tina described the victim's current condition as follows: he suffers from left-sided paralysis and is confined to a wheelchair; he requires supervision with eating; he requires the administration of drops in his eyes six times daily because his eyes do not close, even when he sleeps; and he requires 24-hour care, which is provided by his mother and his sisters.

The victim also testified at trial. He explained how he knew Alexis and Jameshia and stated that he and the defendant were friends. When asked about the incident on January 24, 2016, the victim recalled trying to break up the fight between the defendant and Alexis. Regarding his current medical condition, the victim responded "Well, I got hit right here, they said my skull had broke[n], and so they had to put a plate, I guess, in my head and it affects my left arm and my left leg." The victim confirmed that he has vision loss and requires ongoing physical therapy and rehabilitation due to his head injury. He stated that he "could barely remember things" and that

11

his mother and sisters care for him. According to the victim, he sits in his recliner at home, and has medical appointments two to three times a week.

During cross-examination, the victim admitted that he had prior convictions. However, he denied ever carrying a padlock and he denied hitting the defendant with a padlock on the night of the offense.

Dr. Bharat Guthikonda was accepted by the trial court as an expert in neurosurgery. Dr. Guthikonda testified that the victim suffered an open, depressed skull fracture and brain contusion. He stated that he performed surgery on the victim, which consisted of "a washout of the open laceration, followed by reconstruction of the skull fracture so that it would be back to being contoured, and then a debridement of the lining around the brain and a debridement of the brain tissue that was, you know bruised by the trauma." He further testified that the victim's head wound became infected during his hospitalization, and the infection did not respond to antibiotics. Dr. Guthikonda testified that he reopened the victim's wound and "took out the – his own bone which was fractured . . . and took out any other foreign bodies and then closed the scalp back together[.]" He further testified that the victim suffered "brain damage" as a result of the trauma, and that he has "some difficulty with motor function on the left side of his body." Additionally, approximately 10 months after the incident, he inserted an implant into the defendant's skull to replace the bone that had been removed. According to Dr. Guthikonda, the synthetic implant was necessary to correct the defect and to restore the shape of the defendant's skull.

Dr. Leigh Ransonet Henderson, who was accepted by the trial court as an expert in physical medicine and rehabilitation, testified that she treated the victim for his injuries. She testified that, as a result of the trauma to his

12

brain, the victim suffered "significant cognitive deficits" which impaired "his thinking and his memory and his problem solving, comprehension and expression, getting things out." Dr. Henderson also confirmed that the victim has not regained the use of his left side due to the traumatic brain injury.

Ofc. Marcus Mitchell was recalled as a witness for the defense. He testified that he could not definitively state whether or not the photograph of the padlock was in color or in black and white. When shown a color photograph of the padlock, Ofc. Mitchell testified that there were "a couple of red spots on the lock." On cross-examination, he testified that the padlock was found less than two feet from the pool of blood that had formed under and around the victim's head.

By a vote of 11-1, the jury found the defendant guilty as charged of attempted second degree murder. He was sentenced to serve 35 years at hard labor without the benefit of probation, parole or suspension of sentence. The trial court denied the defendant's motion to reconsider sentence.

The defendant now appeals.

## DISCUSSION

The defendant contends the evidence was insufficient to support his conviction. He argues as follows: the state did not present any evidence to establish that he intended to kill the victim; the victim armed himself with a padlock and was "the first to draw blood" with that weapon; he only procured and used a weapon after the victim struck him with the padlock; there was no "consistent and uncontradicted" testimony that he continued his attack after the victim was on the ground and defenseless; and at most, he

acted in self-defense or under provocation sufficient to prevent him from forming the requisite intent to kill.

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Robinson*, 51,830 (La. App. 2 Cir. 2/28/18), 246 So. 3d 725, *writ denied*, 2018-0573 (La. 2/11/19), 263 So. 3d 897. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S. Ct. 970, 67 L. Ed. 2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Moton*, 46,607 (La. App. 2 Cir. 9/21/11), 73 So. 3d 503, 508; *State v. Bosley*, 29,253 (La. App. 2 Cir. 4/2/97), 691 So. 2d 347, *writ denied*, 1997-1203 (La. 10/17/97), 701 So. 2d 1333.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, *supra*; *State v. Tate*, 2001-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Steines*, 51,698 (La. App. 2 Cir.

11/15/17), 245 So. 3d 224, *writ denied*, 2017-2174 (La. 10/8/18), 253 So. 3d 797.

The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 1994-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Dale*, 50,195 (La. App. 2 Cir. 11/18/15), 180 So. 3d 528, *writ denied*, 2015-2291 (La. 4/4/16), 190 So. 3d 1203. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *State v. Steines*, *supra*.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Steines*, *supra*.

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 2017-1894 (La. 6/1/18), 243 So. 3d 1064. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Mingo*, *supra*. The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational

juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 2007-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584, 587, *writ not cons.*, 2012-0062 (La. 4/20/12), 85 So. 3d 1256.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill" *or* "to inflict great bodily harm," proof of specific intent to inflict great bodily harm is insufficient for a conviction for attempted second degree murder. *State v. Lewis*, 51,672 (La. App. 2 Cir. 11/15/17), 245 So. 3d 233; *State v. Patterson*, 50,305 (La. App. 2 Cir. 11/18/15), 184 So. 3d 739, *writ denied*, 2015-2333 (La. 3/24/16), 190 So. 3d 1190. Louisiana courts have concluded that a conviction for attempted second degree murder requires specific intent to kill. *State v. Bishop*, 2001-2548 (La. 1/14/03), 835 So. 2d 434; *State v. Harris*, 52,541 (La. App. 2 Cir. 2/27/19), 266 So. 3d 953, 956-57, *writ denied*, 2019-00611 (La. 9/17/19). Thus, to sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; La. R.S. 14:30.1; *State v. Bishop*, *supra*; *State v. Harris*, *supra*.

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. *State v. Harris*, *supra*; *State v. Murray*, 49,418 (La. App. 2 Cir. 1/14/15), 161 So. 3d 918, *writ denied*,

16

2015-0379 (La. 4/8/16), 191 So. 3d 582. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop*, *supra*. Specific intent to kill may also be inferred from the extent and severity of the victim's injuries. *State v. Harris*, *supra*, citing *State v. Harrell*, 2001-841 (La. App. 5 Cir. 2/26/02), 811 So. 2d 1015. The determination of whether the requisite intent is present is a question for the trier of fact. *State v. Harris*, *supra*; *State v. Lewis*, *supra*.

In the instant case, the defendant maintains the evidence does not support a finding of specific intent beyond a reasonable doubt. He concedes that the victim "was severely injured in the fight and suffered life-altering injuries." Nevertheless, the defendant asserts that "there was no testimony that [the victim's] injuries were caused by the first blow or by any alleged later blows" delivered by the defendant. We find that this argument is woefully unpersuasive.

As stated above, eyewitnesses testified that the defendant struck the victim in the head with the pole and the victim fell to the ground. According to Rose Hunter and Jameshia Allen, the defendant repeatedly struck the victim as he lay on the ground. Jameshia stated that the defendant "just repeatedly beat – was beating [the victim] in the head." Additionally, Alexis testified that the defendant hit the victim "three or four" times with the pole as he lay on the ground. Alexis, Rose and Jameshia also testified that the victim was not kicking or attempting to get off the ground during the attack. The testimony clearly outlines the brutality of the beating. Further, the police officers and the medical personnel described the extent and severity of the injuries the victim suffered at the hands of the defendant.

17

We find that the testimony of the eyewitnesses, police officers and medical personnel provide overwhelming evidence of the defendant's intent to kill the victim. Specific intent is a question of fact, and the jury was not unreasonable in concluding that the defendant's actions, *i.e.*, repeatedly beating the victim in the head with a pole, while he was on the ground defenseless, until he lay unconscious and motionless in a pool of blood, demonstrated the defendant's intent to kill the victim.

Further, the defendant's reliance on the evidence that the victim was armed with a padlock and wielded the first blow is misplaced. Whether the victim hit the defendant with a padlock in the initial stage of the confrontation does not obfuscate the facts that the defendant retreated to his apartment, returned downstairs, armed himself with a pole/rod, approached the victim, and proceeded to repeatedly beat the victim in the head with the pole. The testimony overwhelmingly demonstrates that the defendant delivered repeated blows to the victim's head once the victim was lying on the ground unmoving and defenseless. There is no evidence in this record to support a claim of self-defense or provocation that would justify this level of violent force. Thus, after reviewing the evidence in the light most favorable to the prosecution, we conclude that the evidence presented was more than sufficient to support the jury's conclusion that the defendant was guilty of attempted second degree murder and had not acted in self-defense. This assignment lacks merit.

The defendant also contends the jury instruction allowing for a nonunanimous verdict, and the jury's 11-1 verdict of guilt, violated his Sixth Amendment rights. He argues that the principle of jury unanimity is a component of the right to a trial by jury and notes that the United States

Supreme Court has granted *certiorari* in *Ramos v. Louisiana*, —— U.S. ——,

139 S. Ct. 1318, 203 L. Ed. 2d 563 (2019), to determine whether the

Fourteenth Amendment fully incorporates the Sixth Amendment guarantee

of a unanimous verdict.[8] The defendant also cites the amended La. C. Cr. P.

art. 782(A), arguing that such amendment supports his argument that the

jury instruction given in his case is unconstitutional.[9]

A constitutional challenge may not be considered by an appellate

court unless it was properly pled and raised in the trial court below. *State v.*

---

[8] In *State v. Ramos*, 2016-1199 (La. App. 4 Cir. 11/2/17), 231 So. 3d 44, *writs denied*, 2017-2133 (La. 6/15/18), 257 So. 3d 679, 2017-1177 (La. 10/15/18), 253 So. 3d 1300, the defendant argued the trial court erred in denying his motion to require a unanimous jury verdict. He asserted that La. C. Cr. P. art. 782 violates the Equal Protection Clause contained in the Fourteenth Amendment of the United States Constitution and Louisiana's statutory scheme permitting nonunanimous jury verdicts in noncapital felony cases should be declared unconstitutional. The court upheld the constitutionality of Article 782, finding that under current jurisprudence from the U.S. Supreme Court, nonunanimous 12-person jury verdicts are constitutional. The court noted that in *State v. Bertrand*, 2008-2215 (La. 3/17/09), 6 So. 3d 738, the Louisiana Supreme Court reversed the trial court's finding that La. C. Cr. P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor.

[9] An amendment to Louisiana Constitution art. I, § 17 was approved by voters in a statewide election in November 2018. That section now provides, in pertinent part:

> A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict[.]

Likewise, the Legislature amended La. C. Cr. P. art. 782(A) in 2018, to provide in pertinent part:

> A case for an offense committed prior to January 1, 2019, in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.

*Hatton*, 2007-2377 (La. 7/1/08), 985 So. 2d 709; *State v. Bertrand, supra.* A constitutional challenge to a state law must be pled or litigated in the trial court in order for the issue to be considered on appeal. *State v. Kennedy*, 49,036 (La. App. 2 Cir. 5/14/14), 140 So. 3d 1201. Additionally, where a statute is alleged to be unconstitutional, the state attorney general must be served with a copy of the proceeding and given the opportunity to be heard. La. C.C.P. art. 1880.

In the instant case, our review of the record reveals that the trial court instructed the jury with regard to the law in effect at the time of the crime of conviction, *i.e.*, that "[t]en of twelve jurors must agree on any verdict you render in this case[.]" The defendant did not object to the jury instruction. Further, the defendant did not properly raise his constitutional challenge of La. C. Cr. P. art. 782 before the trial court, and there was no showing in this record that the attorney general was served with notice of any such challenge. Consequently, the issue was not properly preserved for review and will not be addressed by this Court.

The defendant also contends the sentence imposed is excessive. He argues that the trial court failed to consider or give the appropriate weight to the following mitigating factors: (1) he is a first felony offender; (2) he was provoked when the victim delivered the first blow; (3) his conduct was the result of a situation between best friends and is not likely to recur; (4) a lengthy incarceration will result in a hardship on his five children, especially if they should decide to attend college; and (5) he is only 31 years old.

The defendant also argues that the victim was the aggressor, was the first to arm himself (with a padlock), and delivered the first blow. The defendant characterizes the incident as "mutual armed combat," and

20

maintains that "the role of victim and of victor was assigned by happenstance and fate, and not by an intent to kill" the victim. Further, the defendant asserts that he armed himself in self-defense and was provoked by the victim's actions (striking him with the padlock).

An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. DeBerry*, 50,501 (La. App. 2 Cir. 4/13/16), 194 So. 3d 657, *writ denied*, 2016-0959 (La. 5/1/17), 219 So. 3d 332. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. DeBerry*, *supra*. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. *State v. Jones*, 398 So. 2d 1049 (La. 1981); *State v. DeBerry*, *supra*. There is no requirement that specific matters be given any particular weight at sentencing. *State v. DeBerry*, *supra*; *State v. Shumaker*, 41,547 (La. App. 2 Cir. 12/13/06), 945 So. 2d 277, *writ denied*, 2007-0144 (La. 9/28/07), 964 So. 2d 351.

21

Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 2001-0467 (La. 1/15/02), 805 So. 2d 166; *State v. DeBerry*, *supra*.

The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Williams*, 2003-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Allen*, 49,642 (La. App. 2 Cir. 2/26/15), 162 So. 3d 519, *writ denied*, 2015-0608 (La. 1/25/16), 184 So. 3d 1289. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. *State v. Allen*, *supra*. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Jackson*, 48,534 (La. App. 2 Cir. 1/15/14), 130 So. 3d 993.

The penalty for a conviction of attempted second degree murder is imprisonment at hard labor for not less than 10, nor more than 50 years, without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1; La. R.S. 14:27 D(1)(a).

In the instant case, prior to imposing the defendant's sentence, the trial court first noted that the defendant severely beat the victim, who is now

partially paralyzed and suffers long-term memory loss. The trial court also outlined the factors to be considered pursuant to La. C. Cr. P. art. 894.1, and found the following aggravating circumstances to apply: 1) the defendant's conduct demonstrated deliberate cruelty to the victim; 2) the defendant knew or should have known that the victim was particularly vulnerable or incapable of resistance as evidenced by his continued beating of the victim after the victim was "down" on the ground and defenseless; 3) the defendant knowingly created a risk of death or great bodily harm to more than one person, as there were several people present when the beating occurred; 4) the defendant used threats or actual violence; 5) the offense resulted in significant permanent injury or permanent economic loss to the victim and/or his family; and 6) the defendant used a dangerous weapon in the commission of the offense. Additionally, as a mitigating factor, the trial court considered the letters that the defendant wrote to the victim's family expressing his remorse.[10]

After reviewing this record in its entirety, we find that the trial court complied with La. C. Cr. P. art. 894.1, and recited the aggravating and mitigating factors it found to be applicable. This offense began with the defendant beating his girlfriend and escalated to his repeatedly striking his friend in the head using a steel pipe or rod as a weapon. The defendant delivered multiple blows to the victim's head and shoulder area, causing the victim to fall to the ground defenseless. Once the victim was on the ground,

---

[10] The defendant filed a motion to reconsider sentence urging that the trial judge failed to consider additional mitigating factors. In its ruling denying that motion, the trial court found that the 35-year sentence is not excessive, noting that the defendant's sentencing exposure was 50 years at hard labor. The trial court reiterated that it had considered all of the sentencing factors of La. C. Cr. P. art. 894.1, and found the defendant's expression of remorse, albeit late, as the only mitigating factor.

the defendant continued to strike him in the head with the weapon. The defendant fled and when EMS arrived, they found the victim barely breathing and bleeding from the head with a depressed skull fracture and exposed brain matter. Witnesses testified that the only way it was discernable that the victim was alive was that his breath was "making bubbles" in the pool of blood in which he was lying. The victim suffered extensive, permanent injuries to his brain and body. Consequently, under the facts of this case, we find that a 35-year sentence for this offender does not shock the sense of justice and is not constitutionally excessive. This assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction and sentence.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED.**