Judgment rendered January 15, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,166-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                Appellee

versus

JEROME RICHARDSON                                 Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 344,586

Honorable Charles Gordon Tutt, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Sherry Watters

JEROME RICHARDSON                    Pro Se

JAMES E. STEWART, SR.                Counsel for Appellee
District Attorney

KODIE K. SMITH
WILLIAM C. GASKINS
CHARLES K. PARR
Assistant District Attorneys

* * * * *

Before STONE, COX, and STEPHENS, JJ.

**COX, J.**

This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. Jerome Richardson was charged by indictment with first degree rape in violation of La. R.S. 14:42(A)(1), (2), or (3). Following a jury trial, Richardson was found guilty as charged by a 10-2 verdict. The district court sentenced Richardson to the statutorily mandated sentence of life imprisonment without the benefit of probation, parole, or suspension of sentence. Richardson did not file a motion to reconsider sentence. He now appeals his conviction. For the following reasons, we affirm Richardson's conviction and sentence.

## FACTS

On November 17, 2016, Richardson was charged by indictment with the first degree rape of D.C. The indictment stated that this crime occurred on July 7, 2016. The jury trial commenced on March 11, 2019. The following evidence and testimony was heard by the jury at trial.

The State's first witness was the victim, D.C. D.C. testified that on July 7, 2016, she was visiting Shreveport when she posted an ad on Backpage.com, advertising sex for money. D.C. stated that Richardson responded to the ad by phone, the two agreed to meet, and Richardson agreed to pay $200 or $300. D.C. testified that she was dressed in black Nike tights, a white shirt, a pink and white Nike sports bra, white sandals, and a hair bonnet when she was dropped off by a male friend to a home she suspected Richardson owned. She stated that she observed that the home appeared to be abandoned, and this caused her to fear. D.C. testified that she told Richardson that she did not believe he could pay for her services. She stated that in response, Richardson pulled out a silver gun, put it to her head,

and "made me go in the shed." She testified that she was forced into the shed, the gun was continuously placed to her head, and Richardson told her he would kill her if she ran.

D.C. testified that when they were in the shed, Richardson led her to the back wall and made her take off her clothes. She stated that Richardson took her phone and other belongings and put his penis into her vagina. She stated that he also forced her to perform oral sex. She testified that throughout the sexual acts, he repeatedly threatened her and said he would kill her if she moved. She stated that at some point, Richardson put the gun down, at which time she elbowed him and ran out of the shed naked. D.C. testified that she ran to a house and banged on the door while crying. The woman at the first house did not open the door, but D.C. was able to get help and a t-shirt at the second house from Eric Stacey. D.C. stated that she asked Stacey to call the police.

When the police arrived, D.C. reported what happened to her. However, she did not immediately tell them that she met Richardson on Backpage.com because she feared prosecution for prostitution. Instead, D.C. told them she met Richardson on another website, Tag.com. D.C. subsequently went to the hospital and had an examination for sexual assault. D.C. testified that after the assault, she had abdominal and vaginal pain.

D.C. testified that she searched for Richardson's phone number on Facebook and found his profile. She stated she was certain she located the man who raped her. She stated that she messaged him on Facebook, questioned his earlier actions, and turned his information over to the police. D.C. was able to identify Richardson in open court as the person who raped her.

D.C. testified that a week or two after Richardson was arrested, she was contacted by Richardson's family, specifically his sister, Ashley Richardson, and his father. D.C. testified that she developed a relationship with Ashley, and was offered money to not testify against Richardson. D.C. said she did accept the money and, on at least one occasion, she told Richardson's family that she would not testify. She stated that Richardson's father asked her for sexual favors and requested that she write an affidavit denying the allegation against Richardson, but she declined.

On cross-examination, D.C. admitted that she originally gave police a false name. She told police that her name was Breanna Cole. She also admitted that she told officers that a female friend dropped her off at the house to meet Richardson. D.C. testified that she was unsure how the Richardson family obtained her contact information, but went on to explain that she was contacted by Ashley on Facebook. Ashley gave D.C. her phone number. D.C. admitted that she texted Ashley and requested money, but explained that she was only reminding Ashley of her previous promise to pay one of her bills. She also admitted that in January 2019, when Richardson's trial was initially set to begin, she told Ashley that she would not go to court because of the bond she had formed with Ashley over time. D.C. testified that she was offered $800 not to testify.

On redirect examination, D.C. explained that she told officers a female friend dropped her off to the location instead of a male friend because the male friend had no knowledge of the activities scheduled. D.C. also acknowledged that in her communications with Richardson's family, she never stated that the rape did not occur.

3

Eric Stacey testified next. Stacey testified that on July 7, 2016, he resided at 749 Turner Lane. He stated that after lunchtime, he was home when D.C. knocked on his door naked. He testified that D.C. appeared to have been assaulted, and she was hysterical. He testified that he provided D.C. with a t-shirt and called the police.

Corporal Brutus Pouncy, a patrol officer of the Shreveport Police Department, testified next. He testified that on July 7, 2016, at about 1:30 p.m., he was dispatched to Turner Lane in Shreveport on suspicion of rape. Cpl. Pouncy stated that he made contact with D.C., who told him her name was Breanna Cole. He noted that when he made contact with D.C., she had a t-shirt on, appeared to be shaken up, and had tears in her eyes. He testified that D.C. told him she made contact with a man named Joe Joe, but she did not know him. He stated that D.C. later told him that she met Joe Joe on Tag.com and planned to meet him to exchange sexual favors for money. After Cpl. Pouncy received D.C.'s statement, another officer transported her to the hospital, and he began taping the scene. Cpl. Pouncy testified that he was unable to locate an address for the house where the rape occurred, but noted that it was boarded and there was a shed behind the house. He stated that inside the shed, he observed clothing on the floor.

Corporal John Madjerick, a crime scene investigator of the Shreveport Police Department, testified next. He testified that he was involved in the investigation of the rape. He stated that he went to the scene of the storage shed, did a walkthrough, identified items of evidentiary value, photographed the scene, and collected evidence. Cpl. Madjerick testified that he observed that the shed was vacant with dirt and grime built up. He identified photographs that he took of the scene, which consisted of photos of different

angles of the home, the shed, the backyard, the doors of the shed, and inside of the shed, which showed clothing on the floor. In the shed, Cpl. Madjerick found a black shirt, pink sports bra, a pair of black leggings, pink women's underwear, a pair of white sandals, and a leopard print hair net. He identified these items in open court. He testified that after he collected the items of clothing, he sealed them in a brown paper evidence bag and submitted them to the Shreveport Police Department's property room.

Cpl. Madjerick also processed evidence found in Richardson's mother's home, 7205 Rain Street, where Richardson resided. He recovered a dark gray/silver firearm with a woodgrain handle from the kitchen counter. The firearm was not sent to the crime lab for testing. On cross-examination, Cpl. Madjerick explained that he did not find any hair on the clothing he collected, that there were possible fibers, but the clothing was not tested at the crime lab.

Detective Gilbert Monereau of the Shreveport Police Department Sex Crimes Unit testified next. Detective Monereau testified that he had minimal involvement in the case. He testified that he took a statement from D.C., collected the Physical Evidence Recovery Kit (PERK kit) from the SANE nurse, and transported the kit to the police station. On cross-examination, Detective Monereau acknowledged that he did not complete a report in this case.

Detective Monique Robinson Coleman of the Shreveport Police Department Sex Crimes Unit testified next. Detective Coleman testified that she responded to the crime scene on the day in question and arranged and conducted an interview with D.C. Detective Coleman testified about the following exchange she had with D.C. on July 13, 2016. D.C. told Detective

Coleman that she was in town visiting friends when she created an ad on Backpage.com. D.C. told Detective Coleman that she met a man named Joe Joe, they discussed companionship, and D.C. agreed to meet him. She testified that D.C. stated that she had a friend drop her off near the location, and after her arrival, Joe Joe changed the location. D.C. told Detective Coleman that when she arrived at the new location, she saw a black man standing near a fence. D.C. felt uneasy about the man's physical appearance and the appearance of the house where they met. D.C. told Detective Coleman that she told the man that she would leave. The man then reached into his pocket, brandished a silver handgun, pointed the handgun at D.C., grabbed her by her hair, and dragged her into the shed. D.C. told Detective Coleman that the man took her personal belongings, which included her identification and cellphone, and then vaginally raped her. D.C. told Detective Coleman that in addition to raping her, the man threatened her repeatedly and made her perform oral sex on him. At some point, D.C. pleaded with the man to stop. She told Detective Coleman that she was able to persuade the man to put the gun down, and at that point, she ran away naked and began beating on doors. D.C. stated she was able to make contact with one of the neighbors, who provided her with a t-shirt and called the police.

Detective Coleman testified that they were not initially able to develop a suspect, but eventually developed a suspect with D.C.'s help. Detective Coleman was able to match the physical description that D.C. originally gave of the suspect with the image on a Facebook profile that D.C. provided to detectives. Once Detective Coleman had a suspect, she stated that she obtained a search warrant for his residence. She testified that

6

Richardson's mother indicated that he lived in the home and had intentions of moving, but his personal belongings remained in the home. As a result of the search, Detective Coleman recovered several cell phones and a handgun. Detective Coleman testified that she was able to retrieve some data from the collected cellphones, but that some of the cellphones were unable to be processed.

Detective Coleman further testified that she transferred the PERK kit and DNA and/or buccal swabs from Richardson to the North Louisiana Crime Lab. She stated that after she transferred both pieces of evidence, she was notified that DNA matching Richardson was found on evidence collected from D.C. She testified that Richardson was then charged with first degree rape. Detective Coleman identified Richardson in open court as the suspect. On cross-examination, Detective Coleman agreed that D.C. told her she had been dragged by her hair, but that they did not recover any hair from the scene.

Next, Detective Michael Jones, a sex crimes detective with the Shreveport Police Department, testified. Detective Jones testified that he collected DNA from Richardson. Detective Jones identified the DNA buccal swabs in open court. On cross-examination, Detective Jones acknowledged that he did not complete a report in this case.

Kimberly Donelson, the SANE nurse who conducted the evaluation of D.C., testified next, and was accepted as an expert in forensic sexual assault examination. Ms. Donelson testified that on July 7, 2016, at about 3:20 p.m., she completed a medical evaluation and a forensic collection of evidence with D.C. She noted that D.C. appeared tense and tearful. She stated that D.C. had not showered from the time of the assault until the

7

examination. Ms. Donelson testified that she conducts an alternate light source evaluation on every patient. She explained that the alternate light source indicates possible locations of semen. She testified that during D.C.'s examination, the alternate light source had a positive reaction to D.C.'s genital area. Ms. Donelson stated that she performed another exam that uses a substance called toluidine blue dye, which returned no results. She testified that toluidine blue dye does not always show whether or not a person was raped. She stated that none of her findings indicated trauma, but that only 20 percent of patients have traumatic injuries.

Ms. Donelson testified that she collected clothing from D.C. and turned the clothing and the PERK kit over to detectives. She identified the PERK kit in open court, which included blood samples, saliva samples, cervical swabs, perineal swabs, vaginal washings, oral swabs, fingernail swabs, pubic hair combings, and external genital swabs. Ms. Donelson stated that she also turned over her report to detectives. In her report, Ms. Donelson noted that D.C. stated that she had a pain level of 8 out of 10, with pain in her private area. On cross-examination, Ms. Donelson admitted that she did not observe any surface injuries in D.C.'s genital area. She did, however, testify that she observed a rub abrasion.

Next, Kari Shiffman Dicken, a forensic DNA analyst with the North Louisiana Crime Lab, testified. Ms. Dicken was accepted as an expert in forensic DNA analysis. Ms. Dicken testified that she received D.C.'s PERK kit on July 11, 2016, which contained reference samples from D.C. On August 22, 2016, she received reference samples from Richardson. On August 23, 2016, she received a swab from the grip of a gun. Ms. Dicken identified the report she generated in this case in open court. Ms. Dicken

8

testified that she conducted two DNA analyses in this case. She stated that she conducted autosomal testing, which is looking at the entire DNA strand, and Y chromosome testing, which looks at the specific Y chromosome. She explained that she compares the evidence samples to the known reference samples and checks for consistencies.

Ms. Dicken testified that when she receives a PERK or sexual assault kit, she first screens the samples looking for prostate-specific antigen as well as sperm. She stated that if those items are present, it indicates sexual contact. She testified that she conducted the initial screening as well as DNA analysis for autosomal and Y STR testing on the two external genitalia swabs, which tested positive for prostate-specific antigen, a fluid present in the male prostate and an indicator for semen. She confirmed that she was able to determine that the DNA profile for the autosomal testing of the external genitalia swab was consistent with the reference sample from D.C., and the DNA profile for the Y STR testing of the external genitalia swab was consistent with the Y STR profile from Jerome Richardson.

Ms. Dicken testified that she conducted the initial screening as well as autosomal and Y STR testing on the two perineal swabs, which tested positive for prostate-specific antigen. Ms. Dicken testified that she obtained a DNA profile from this testing. The DNA profile for the autosomal testing was consistent with D.C. and the Y STR profile was consistent with Richardson. She testified that she conducted the initial screening as well as autosomal and Y STR testing on the vaginal washings, which tested positive for prostate-specific antigen. Ms. Dicken testified that the DNA profile for the autosomal testing was consistent with D.C. and the Y STR profile was

9

consistent with Richardson. She explained that DNA evidence can be found up to 7 days after sexual intercourse.

Ms. Dicken stated that she conducted autosomal testing on the swab from the grip surface of a gun. She stated that she was able to conclude that the DNA profile was consistent with being a mixture of two individuals. D.C. and Richardson were both excluded as major contributors to this item, and the minor contributor was inconclusive.

On cross-examination, Ms. Dicken explained that Y chromosome testing includes looking specifically at the DNA structure of the Y chromosome, which is only present in males and comes from your father. She further explained that where she found Y chromosomes in this case, the results included Jerome Richardson and any other male in his paternal lineage.

The State's final witness was Vonetta Morris. Ms. Morris testified that on May 5, 2015, she was a victim of sexual assault that occured at DiamondJacks Casino in Bossier City, Louisiana. She explained that she was working as an escort and/or prostitute on Backpage.com. Ms. Morris testified that she posted an ad on Backpage.com and that "Derrick" responded to her ad by phone. She stated that she scheduled an appointment with Derrick for 1:30 p.m., but Derrick missed the appointment, and it was rescheduled to 2:30 p.m. She testified that Derrick also missed his 2:30 p.m. appointment, so his appointment was terminated. Ms. Morris testified that she never provided Derrick with her room number. However, at about 3:00 p.m. Derrick arrived at Ms. Morris' room. She stated that when she opened the door, she did not know who he was. She testified that he told her that her boyfriend, who was at the casino, told him to "get a signature from me,"

and he then said he wanted to make an appointment. Ms. Morris stated that she did not understand what he meant but allowed him inside. She identified Richardson in open court as the man she allowed inside her room.

Ms. Morris testified that when Richardson entered the room, the two began to talk, and Richardson pulled out a black and gray gun and set it down. She stated that at some point, the conversation led to "business." Ms. Morris testified that she informed Richardson that she would charge $100 for 15 minutes of her time. She stated that Richardson began to take off his clothing, but she informed him that she required the money first. She stated that Richardson indicated he left his money, and when she turned away from him to reach for a condom, he placed a gun to her head. Ms. Morris testified that she put her hands up and Richardson began looking through her things for money. She stated that when Richardson's search yielded no money, he told Morris that he wanted to have sex. She testified that Richardson touched her private area without her consent.

Ms. Morris testified that she asked Richardson to retrieve a condom, and in doing so, he put the gun down. She stated that she reached for the gun and the two began fighting, and she bit Richardson. She stated that Richardson eventually overpowered her, put the gun to her head again, told her to sit down, threatened to kill her, and then told her to go to the closet. She testified that as she got up, she ran out of the room and to the nearest room for help. She stated that she received help and the police were called. Ms. Morris testified that she cooperated in the investigation but did not know how the case was resolved. At the conclusion of Ms. Morris' testimony, the State rested.

11

The defense called Ashley Richardson, Richardson's sister, as its first witness. Ashley testified that a couple of weeks after the alleged incident, D.C. contacted her via Facebook Messenger. She stated that she also spoke with D.C. via phone and text messages. Ashley testified that D.C. requested and received approximately $3,000 from her and her father. She testified that D.C. constantly called and texted regarding money. Ashley testified that D.C. wanted to "help" her family, but that she told D.C. that she needed to "help" herself by going to counseling. Ashley also provided copies of receipts for money sent to D.C.

On cross-examination, Ashley acknowledged that she was not present when Richardson came into contact with D.C. Ashley also clarified that contact with D.C. began a couple of weeks after Richardson was arrested, not a couple of weeks after the incident. The State was able to show that the messages Ashley provided started in May 2017, but Richardson was arrested in July 2016. Ashley also agreed that D.C. did not state in the messages that the rape did not occur. However, Ashley testified that D.C. told her via phone that the incident never happened. Ashley stated that she gave D.C. money because she wanted to reimburse D.C. for what she claimed Richardson stole from her.

Ashley admitted that she asked D.C. to write a statement indicating that the rape never occurred. Ashley acknowledged that the earliest receipt that she provided to the court for payment to D.C. was December 3, 2016. Ashley testified that at some point she began to tell D.C. "no" when she requested money, but that D.C. would then threaten to testify if she did not receive money. Ashley testified that she became friends with D.C. and periodically checked on her and her kids.

Ashley stated that she was present with Richardson when he went to DiamondJacks Casino in May 2015. She testified that when Richardson returned to the car where she was waiting, he was bloody. On redirect, Ashley stated that the text messages that were presented between D.C. and herself were not all of the text messages that she exchanged with D.C.

The defense's second and final witness was Jerome Hogan, Richardson's father. Mr. Hogan testified that he communicated with D.C. primarily by telephone. He stated that at some point he met D.C. in person in Louisiana at a strip club called Black Diamond. He also met D.C. in Texas and provided her with money to eat. Mr. Hogan testified that between himself and his daughter, they gave D.C. approximately $2,800.

On cross-examination, Mr. Hogan stated that D.C. claimed she and Richardson had consensual sex, but that her money and phone were stolen so he wanted to reimburse D.C. He admitted that he was not present when Richardson made contact with D.C. so he does not know what happened. At the conclusion of Mr. Hogan's testimony, the defense rested.

The district court, the State, and the defense debated about the language to include in jury instructions. The district court inquired as to the necessity of including language that said other crimes evidence is "considered on any matter which is relevant." The State argued that the language was necessary. The district court also inquired about whether the instruction should include language that discussed the introduction of other crimes evidence for the "sole purpose" of showing that the defendant had a propensity toward sexually assaultive behavior. The State argued that the language was also necessary. The State, the defense, and the district court eventually agreed that the instruction should say:

Evidence of another crime, wrong, or act involving sexually assaultive behavior may be considered on any matter to which it is relevant. The accused is on trial, however, only for the offense charged. You may not find him guilty of this offense merely because he may have committed another offense.

By a 10-2 vote, the jury found Richardson guilty as charged. On April 11, 2019, prior to sentencing, Richardson filed a motion for post-verdict judgment of acquittal. Richardson asserted that the verdict was contrary to the law and evidence at trial and that the evidence was insufficient to establish that sexual contact between D.C. and Richardson was without consent. Richardson requested that the guilty verdict be set aside and a verdict of not guilty be entered. The State contended that evidence showed that a sexual assault occurred and that the jury reached a just verdict of guilty as charged of first degree rape. Richardson's motion was denied.

Richardson also files a motion for new trial. He argued that the State used its La. C.E. art. 412.2 notice in an attempt to get around La. C.E. art. 404(B), and that although the State argued that it would show a pattern of behavior, the State merely showed that Richardson was a person of bad character, in violation of La. C.E. art. 404(B). He asserted that he was deprived of a fair trial.

The State responded that in its arguments before the jury, it repeatedly told the jury that they were only to consider what happened in the shed. The State also argued that there were safeguards within the jury instructions to prevent the jury from finding Richardson guilty solely on a prior bad act. The State argued that the La. C.E. art. 412.2 motion was solely to show Richardson had a propensity toward sexually assaultive behavior. According to the State, the evidence showed preparation, plan, motive, and

14

intent. The State argued that Richardson failed to object when it made a statement about "pattern of behavior." The district court noted that it granted the La. C.E. art. 412.2 motion because the events in Ms. Morris' assault were strikingly similar to those in this case. The district court also noted that the jury charges were adequate and there was no doubt that Richardson committed a rape in the shed on the day in question. The motion for new trial was denied.

On April 16, 2019, the district court also denied Richardson's pro-se motion for post-verdict judgment of acquittal. The following day, Richardson was sentenced. In accordance with La. C. Cr. P. art. 894.1, the district court found that there was an undue risk Richardson would commit another crime during a period of a suspended sentence or probation; Richardson was in need of correctional treatment or custodial environment that could be provided most effectively by his commitment to an institution; and that a lesser sentence would deprecate the seriousness of his crime. As aggravating factors, the district court found that Richardson's conduct during the commission of the offense manifested deliberate cruelty to the victim; he used threats or actual violence in the commission of the offense; the offense resulted in a significant permanent injury or significant economic loss to the victim; Richardson used a dangerous weapon in the commission of the offense; and, the offense represented a persistent course of conduct as shown by the evidence admitted. The district court also stated, "I don't think any victim of rape ever gets over the rape." The district court considered the mitigating factors outlined in La. C. Cr. P. art. 894.1 and found none applicable.

The district court sentenced Richardson to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. Richardson objected to the sentence in open court, but did not file a formal motion to reconsider sentence. Richardson now appeals.

## DISCUSSION

*Unanimous Jury Verdict*

Richardson argues that a non-unanimous jury verdict does not support a felony conviction and thus does not satisfy due process. Richardson argues that the non-unanimous jury verdict eased the State's burden of proof and allowed a conviction on evidence that did not establish every element of the crime. He argues that a unanimous jury verdict would be significant in in his case because of the many inconsistencies in D.C.'s statements. Richardson asserts that a unanimous jury verdict protects against "insidious influences." He ultimately argues that a non-unanimous jury verdict is unconstitutional.

The State argues that the requirement of a unanimous jury conviction specifically applies only to crimes committed after January 1, 2019. The instant crime was committed in 2017.

An amendment to Article I, § 17 of the Louisiana Constitution was approved by voters in November of 2018. That Section now states:

> Jury Trial in Criminal Cases. A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.

The Legislature amended La. C. Cr. P. art. 782(A) in 2018 to provide, in part:

> A case for an offense committed prior to January 1, 2019, in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.

In *State v. Ramos*, 16-1199 (La. App. 4 Cir. 11/2/17), 231 So. 3d 44, *writs denied*, 17-2133 (La. 6/15/18), 257 So. 3d 679, and 17-1177 (La. 10/15/18), 253 So. 3d 1300, Ramos argued that the trial court erred in denying his motion to require a unanimous jury verdict. Ramos complained that La. C. Cr. P. art. 782(A) violated the Equal Protection Clause, and that Louisiana's statutory scheme permitting non-unanimous jury verdicts in non-capital felony cases should be declared unconstitutional. The Fourth Circuit held in Ramos that under current jurisprudence from the U.S. Supreme Court, non-unanimous 12-person jury verdicts are constitutional. In reaching this result, the court in Ramos noted that in *State v. Bertrand*, 08-2215 (La. 3/17/09), 6 So. 3d 738, the Louisiana Supreme Court reversed the trial court's finding that La. C. Cr. P. art. 782(A) violated the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The Louisiana Supreme Court stated as follows:

> Due to this Court's prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.

*Id*.

17

On March 18, 2019, the United States Supreme Court granted certiorari in *Ramos* to consider whether the Fourteenth Amendment fully incorporates the Sixth Amendment guarantee of a unanimous verdict. *Ramos v. Louisiana*, -- U.S. --, 139 S. Ct. 1318, 203 L.Ed.2d 563 (2019). However, under current jurisprudence from the United States Supreme Court, non-unanimous 12-person jury verdicts remain constitutional.

The indictment in this case alleges that this crime occurred on July 7, 2016. Accordingly, on the date of the commission of the crime, a non-unanimous jury verdict was constitutional. At the time of the writing of this opinion, non-unanimous jury verdicts prior to January 2019 are constitutional. Accordingly, this assignment of error is without merit.

*Insufficient Evidence*

Richardson argues that the State failed to show sufficient evidence of lack of consent to sexual intercourse. Richardson argues that the state failed to prove all of the elements of first degree rape beyond a reasonable doubt. Specifically, he asserts that D.C. changed her statement three times, but she agreed each time that she met Richardson to exchange sex for money. He also asserts that there was no evidence of trauma. Richardson points out the following inconsistencies:

- D.C. gave a different name to at least one officer.

- D.C. told one officer that she was in town to visit friends and at trial testified that she was in town to make money.

- D.C. changed her story about a female dropping her off to a male dropping her off.

- D.C. changed her story from having met Richardson on Tag.com to Backpage.com

- D.C. told one officer she was raped by an unknown man, told another his name was JoJo, but at trial denied saying JoJo.

18

• D.C. at one point said she knew Richardson was married but told another officer she did not know he was married.

• D.C. said Richardson planned to pay $300.00 for companionship only, then said he agreed to pay $200.00 for sex and later said he agreed to pay $300.00 for 3 hours.

• At one point, D.C. said she walked to the shed because she was being held up by the gun. She also said she was drug to the shed by her hair. She also said she was pulled by her hair.

• D.C. said her ride left. She also said her ride kept calling her phone.

• D.C. said at some point Richardson paused and she ran. She later said she just ran. She also said he put the gun down and she ran. She also said she elbowed him and then ran.

Richardson argues that each story D.C. told was different. He asserts that the sexual contact is not disputed, but there is no evidence of sexual trauma to support D.C.'s allegations of nonconsensual sex. He argues that D.C. did not have any bruising or blood, she did not have any hair missing, and she had no injuries to her head. He points out that although her clothes were found in the shed, there was no sign of a skirmish there.

The State argues that the testimony at trial showed that the evidence was sufficient to convict Richardson of first degree rape. The State asserts that the jury heard all of the testimony and evidence that was submitted by both sides at trial concerning the lack of consent and the victim testified that at no point did she consent. The State points out that D.C. told more than one officer that she had been raped. The State argues that all the inconsistencies that the defense points out are irrelevant details. The State highlights that D.C.'s story was corroborated by testimony from Corporal Pouncy and Detective Coleman that she was forced into a shed of an abandoned home at gunpoint and orally and vaginally raped and the jury deemed D.C. credible.

19

When issues are raised on appeal, both as to the sufficiency of evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed. 2d 30 (1981); *State v. Cooley*, 51,895 (La. App. 2 Cir. 5/23/18), 247 So. 3d 1159, *writ denied*, 2018-1160 (La. 3/6/19), 266 So. 3d 899.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797.

This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Steines, supra.* The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Dale*, 50,195 (La. App. 2 Cir. 11/18/15), 180 So. 3d 528, *writ denied*, 15-2291 (La. 4/4/16), 190 So. 3d 1203. A reviewing court affords

great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Steines, supra.* Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Lattin*, 52,127 (La. App. 2 Cir. 9/26/18), 256 So. 3d 484.

Direct evidence provides proof of the existence of a fact, for example, a witness' testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985); *State v. Coleman*, 52,074 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1203. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 17-1894 (La. 6/1/18), 243 So. 3d 1064. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *Mingo, supra.*

The Jackson standard is applicable in cases involving both direct and circumstantial evidence. *State v. Mathis*, 52,500 (La. App. 2 Cir. 1/16/19), 263 So. 3d 613. When the direct evidence is viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Steines, supra.*

La. R.S. 14:42 provides, in pertinent part:

A. First degree rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of

21

the victim because it is committed under any one or more of the following circumstances:

(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.

(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

….

D. (1) Whoever commits the crime of first degree rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

D.C.'s testimony established that she placed an ad on Backpage.com to exchange sex for money. Richardson responded to that ad. D.C. was dropped off at an abandoned home on Turner Lane to meet Richardson. She did not think Richardson had the funds to complete the transaction and she felt uneasy about the abandoned home. D.C. wanted to leave, but Richardson placed a gun to her head and forced her into the shed. There, he held her at gunpoint, made her take off her clothing, took her belongings, forced her to perform oral sex, and vaginally raped her. When Richardson put the gun down, D.C. ran naked to neighboring homes for help. D.C. provided a statement to police. Although some of the details were inaccurate or changed over time, her assertion that she was raped in the shed never changed. D.C. searched the phone number Richardson used when he responded to her ad to locate his Facebook profile and ultimately identified her attacker. She subsequently identified him in a photographic lineup and in open court.

Ms. Donelson, the SANE nurse, testified that she performed an evaluation on D.C. Her results were not indicative of any surface injuries or trauma, but she testified that in many cases there are no signs of physical injury following a sexual encounter. In addition, the alternate light source had a positive reaction to D.C.'s genital area for the presence of semen. Ms. Dicken, the forensic DNA analyst, testified that she conducted autosomal and Y STR testing of genitalia swabs, perineal swabs, and vaginal washings. Her findings showed that each was positive for prostate-specific antigen. Ms. Dicken also testified that she was able to determine that the DNA profile for the autosomal testing of each of the swabs was consistent with the reference sample from D.C. and the DNA profile for the Y STR testing was consistent with the Y STR profile from Jerome Richardson.

While the testimonies of Ms. Donelson and Ms. Dicken were merely indicative that sex likely occurred, the jury deemed D.C. credible. No evidence was presented to contradict D.C.'s testimony. The fact that Richardson's family provided money to D.C. does not discredit her testimony. The text messages that Richardson presented showed that D.C., at one point, may have considered not showing up for court and/or writing an affidavit, but none of the messages dispute that the rape occurred.

The evidence presented was sufficient to support the jury's reasonable conclusion that Richardson forced D.C. to have sex, vaginal and oral, at gunpoint and, thus, was guilty of first degree rape. Accordingly, this assignment of error is without merit.

*Evidence of Other Bad Acts*

Richardson argues the trial court erred in allowing evidence of other bad acts and other crimes where the State's purpose was "to show

23

propensity." He argues that only at the conclusion of trial, after their error became obvious, did the State change the alleged purpose. He asserts that the State failed to show a legitimate purpose for the use of the prior uncharged incident and the prejudicial effect of the evidence outweighed what probative value it may have had. The trial court did not grant a new trial based on the alleged error. Richardson argues the trial court erred in failing to give a contemporaneous instruction as to the limited use of the evidence and the instruction provided with the general instructions was incorrect and insufficient. Richardson asserts that the admission of the other crimes evidence does not meet exceptions in either La. C.E. arts. 404(B)(1) or 412.2.

Richardson argues the evidence of the other non-charged incident was highly prejudicial and served no legitimate purpose or relevance to the pending charge. He asserts that the improper admission prevented him from receiving a fair trial. He points out that the State argued that its use of the other crime was to show a propensity for sexually assaultive behavior, which Richardson asserts is not a valid reason.

Richardson further argues that the trial court failed to give a contemporaneous instruction at the time the evidence was presented and failed to give the instruction with the jury charge. The instruction, Richardson suggests, was necessary to show that the prior incident could not be used to show "propensity." Richardson argues that "propensity evidence presents a risk that a jury will convict for crimes other than those charged— or that—uncertain of guilt, it will convict anyway because a bad person deserves punishment-[this] creates a prejudicial effect that outweighs ordinary relevance."

24

Richardson argues that the issue in this case was consent, not identity or intent. Thus, there was no genuine purpose for the use of the prior incident. He asserts that only after the evidence was introduced did the State argue that the evidence was being used to show a plan or pattern. Ultimately, Richardson argues that the evidence of the other alleged bad act was more prejudicial than probative and prevented a fair trial.

The State argues that Richardson failed to object to the State's amendment to the jury instructions to include language as to the purpose of the other crimes evidence, thus Richardson has waived any claim based on this ground. The State asserts that Richardson did not object to the district court's reading of the jury instructions where it allegedly incorrectly instructed the jury that the other crimes evidence could be used for any relevant matter. Thus, again, the State contends that Richardson has waived any claim based on this ground.

The State also argues that it never changed its purpose for the introduction of the other crimes evidence. It contends that Richardson never articulated the basis for his objection to the other crimes evidence with the district court, and is precluded from raising the issue for the first time on appeal. It asserts that the probative value was significant because it showed Richardson's propensity to engage in sexually assaultive behavior without the consent of his victims. The State argues that Richardson was protected by the jury instructions from any undue prejudice.

We find that the record reflects that Richardson failed to object prior to, during, or after the testimony of Vonetta Morris and did not object to the jury charge at the time it was given. An irregularity or error cannot be availed of after the verdict unless it was objected to at the time of

occurrence. La. C. Cr. P. art. 841(A). In order to preserve an issue for appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. *State v. Boyette*, 52,411 (La. App. 2 Cir. 1/16/19), 264 So. 3d 625. Additionally, for the reasons outlined above, there was sufficient evidence presented outside of Ms. Morris' testimony for the jury to find Richardson guilty of first degree rape. Accordingly, this assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, Richardson's conviction and sentence are affirmed.

**AFFIRMED.**