Judgment rendered May 20, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,470-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

DAVID MICHAEL BULL                    Appellant

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Union, Louisiana
Trial Court No. 2018F55613

Honorable Bruce E. Hampton, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Carey J. Ellis, III
    Paula C. Marx

JOHN F. BELTON                       Counsel for Appellee
District Attorney

CLIFFORD R. STRIDER, III
Assistant District Attorney

* * * * *

Before WILLIAMS, MOORE, and THOMPSON, JJ.

**WILLIAMS, C. J.**

The defendant, David Michael Bull, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1(A)(1). Following a trial, the jury returned a unanimous verdict of guilty as charged. Defendant was sentenced to serve the mandatory term of life imprisonment without the benefit of probation, parole, or suspension of sentence. The defendant has appealed, urging that the state failed to present sufficient evidence to support his conviction. For the following reasons, we affirm the defendant's conviction and sentence.

## FACTS

On Thursday, February 15, 2018, deputies from the Union Parish Sheriff's Office ("UPSO") were called to the scene of a deceased male found in a wooded area off King Johnson Road in Marion, Louisiana. The victim was 53-year-old Jerry Dean "Red" Ramsey, who lived in a house with his elderly mother close to the scene. An investigation was begun, and the defendant was soon identified as the suspect, taken into custody, and interviewed. Defendant, post-*Miranda*, confessed to shooting the victim.

On March 15, 2018, the defendant was indicted by a grand jury for the second-degree murder of the victim. Thereafter, a hearing was held on the admissibility of the defendant's statements. Detective Harrison Cade Nolan, a detective sergeant in the Criminal Investigations Division of the UPSO, testified that at 9:30 p.m. on February 15, 2018, in the presence of himself, Sgt. Michael Bryan and Dy. Michael Estes, the defendant made a statement regarding the victim's death. In his statement, *inter alia*, the defendant asserted the following:

> While he was walking through the woods he thought he saw flashlights by the hog pen,[1] and he ran to tell the victim. When the defendant contacted the victim, he was rambling, talking wild and crazy, while loading his .22 Magnum rifle and shotgun. The victim gave the shotgun to the defendant. As they started walking, the victim took the lead, but when they got to the hog pen area, the flashlights were gone. At that time, the victim accused the defendant of lying and trying to steal from him and said that he would shoot the defendant. According to the defendant, he felt that if he tried to walk away, the victim would shoot him, so the defendant shot Ramsey first. It was around 8:00 or 9:00 p.m. that evening [February 14, 2018].
>
> The defendant stated that he then ran away, disassembling the shotgun and throwing it away, along with the shell case, into a pond on his way home. The next morning, the defendant went back to the victim's body to remove the flashlight and .22 Magnum rifle, which he returned to the victim's house.

Det. Nolan testified that the defendant's statement was made after he was advised of his *Miranda* rights, as evidenced by the explanation of rights form signed by the defendant, and the statement was later transcribed.[2] Det. Nolan also testified that the defendant made a separate statement about the victim's death to Bruce Allen Spencer, Jr. ("Spencer"), who was neither a police officer nor in any other way connected to law enforcement. The trial court determined that both statements were admissible at trial.

On April 22, 2019, the jury of 12 plus one alternate was selected, and trial began the following day. After opening arguments, the state's first witness was Christian Danielle Johnson. Ms. Johnson testified that she was working at the Super Save on February 15, 2018, when around 9:00 a.m., she received a text message from the defendant. In the message, the

---

[1] The defendant described the "hog pen" as a horse trailer parked in the woods along a pipeline behind the victim's house that the defendant and the victim sometimes used as a deer stand.

[2] The signed form and transcription were entered into evidence by the state at the hearing.

defendant asked if she could give him a ride. Ms. Johnson responded to let the defendant know that she was at work. Ms. Johnson testified that she then sent a text to her boyfriend, Spencer, to let him know about the defendant's text message. Spencer texted Ms. Johnson back to inform her that the defendant had messaged him too looking for a ride. Ms. Johnson stated that when she got off work around noon, she went to her home, where Spencer was keeping her three children. When she got to the house, Spencer took Ms. Johnson's van to pick up the defendant. Ms. Johnson testified that Spencer left around 12:30 or 1:00 p.m. and was gone for about an hour or two. According to Ms. Johnson, when Spencer returned, she took him to his house to pick up his truck. While they were on their way to Spencer's house, Spencer told Ms. Johnson that he needed to go check on his friend Ramsey, whom the defendant had shot. Ms. Johnson described Spencer as being in shock.

Ms. Johnson testified that she dropped Spencer off at his house, but he called her to come back and get him because his truck needed gas. After they filled the vehicle with gas, they took the truck over to Tiger Bend Road, which was where both the victim and Spencer's friends, Shannon and R.G., lived. Ms. Johnson stated that they drove to Shannon and R.G.'s house to get directions to the "hog pen thing," which was where Spencer believed the victim might be. According to Ms. Johnson, they picked up Shannon and R.G., and Spencer asked whether they had heard gunshots between midnight and 1:00 a.m. Both said that they had. Ms. Johnson stated that R.G. knew exactly where the hog pen was. She later described the location as a wooded area with a house on the left and a little camp trail that goes back towards power or high lines. Ms. Johnson stated that when they got there, Spencer

3

drove back toward the high lines, and they were "atop a hill, in the woods, on a trail." She also stated that they all got out of the truck, but only Spencer, R.G., and Shannon went down to the hog pen; she went about five or six feet down the hill and then stopped. Ms. Johnson testified that R.G. went all the way down the hill and found the victim lying on the ground, dead. Shannon then called the police around 3:30 p.m. or 4:00 p.m. Ms. Johnson testified that she never saw the body, but she gave a statement to the sheriff's office.

On cross-examination, Ms. Johnson testified that she had known the defendant for approximately one year, but would not consider him a close friend; he was Spencer's friend. She stated she only received one text message from the defendant on February 15, 2018, and never actually spoke with him. She also testified that the defendant never indicated why he needed a ride that day. On redirect examination, Ms. Johnson reiterated that Spencer was at home with her three children, and he had no vehicle at the time he was initially contacted by the defendant.

The state's next witness was Spencer, who testified that he knew the defendant, whom he identified in open court. Spencer stated that he received a text message from the defendant around 9:00 a.m. on February 15, 2018, asking him to come pick him up. Spencer testified that he did not respond immediately because he was babysitting his girlfriend's children and had no transportation. According to Spencer, he responded to the defendant around lunchtime. The defendant would not tell him the reason he needed to be picked up or where he needed to go.

Spencer testified that around 12:30 p.m. or 12:45 p.m., once Ms. Johnson got home and he had a vehicle, he arranged via text message to pick

4

up the defendant. Around 1:15 p.m., Spencer picked up the defendant from a spot close to the stop sign on Tiger Bend Road. Spencer stated that the defendant was dressed in shorts and had a backpack. Spencer testified that as soon as the defendant got into the van, he said that he wanted to go to Bernice. Defendant then began telling Spencer that he shot the victim, broke down the gun he used, and threw the weapon into the victim's pond. According to Spencer, "[the defendant] pretty much told me everything he'd done." Spencer testified that the defendant told him the shooting took place around 12:00 midnight or 12:30 a.m. The defendant told Spencer that he had a friend in Bernice. He did not otherwise say why he wanted to go there. Spencer stated that he dropped the defendant off at the dumpsters behind Shiloh Baptist Church, which was approximately five miles outside of Bernice. According to Spencer, he was in shock and was not sure that he believed the defendant.

Spencer testified that he went back to Ms. Johnson's house and had her take him to his house to get his truck. Next, they went to Shannon's house. Shannon was his son's uncle. Spencer explained that because Shannon knew where the hog pen was and Spencer did not, he picked up Shannon and R.G. to show him the location so he could see whether the defendant had told him the truth about shooting the victim. Spencer described the hog pen as a densely wooded hunting area with high lines. Spencer testified that upon arrival at the hog pen, everyone got out of the truck, and all but Ms. Johnson walked down the hill. According to Spencer, R.G. was the first to see the victim's body, which was off to the right of the trail. Spencer related that he got close enough to see the victim's feet and

coveralls. Spencer testified that the victim wore those particular coveralls "everywhere."

Upon seeing the victim's body, Spencer turned to ask Shannon for his cell phone to call the police, but Shannon was already making the call. Spencer testified that the victim was a dear friend whom he had known for about eight years.[3] Spencer further testified that his truck was parked about 60 yards from the victim's body at the top of the hill in a clear area between the woods. The state then introduced into evidence a photograph of the victim's body as it lay in the woods.[4] Spencer testified that to his knowledge no one touched the victim's body or turned his pocket inside out.

On cross-examination, Spencer confirmed that, at the time of the incident, he had known the defendant for about eight months, and the defendant had stayed a few nights at his house to help him do some work. Spencer also testified that the defendant had tried to contact him on Facebook Messenger on February 15, 2018, but he had been asleep. Spencer related that the defendant had him stop at Shiloh Baptist Church, approximately five miles outside of Bernice. He further reiterated that the defendant told him that he threw the shotgun into the pond. Spencer described the "hog pen" as a place that hunting clubs use and, although he had been to that area before, he had not known that was what it was called. Spencer also stated that he had known the victim well; the two men had

_____

[3] Spencer identified the victim in a photograph introduced into evidence by the state.

[4] Defense counsel objected to this photograph as unduly prejudicial. The trial court overruled the objection, finding that the photo was relevant and that its probative value substantially outweighed any danger of unfair prejudice, confusion of the issues or misleading of the jury. The trial court further noted the witness's testimony that the photo was a fair and accurate depiction of what he saw.

6

"hung out together quite a bit." On redirect, Spencer stated that the hog pen was the location named by the defendant as where he had shot the victim and was where the victim's body was found.

The state next called Detective Nolan, who testified that on February 15, 2018, he responded to a crime scene at the hog pen, which is near King Johnson Road in Marion, Louisiana. The report that the sheriff's office had received was that a deceased person with a gunshot wound to his back had been found. Det. Nolan testified that when he arrived around 5:00 p.m., he and the other officers were led to the body by a man, who identified himself as Spencer. Det. Nolan testified that the crime scene was secured, and it was established that the person was in fact deceased. Sheriff Gates, who was on the scene supervising, had some of the officers transport witnesses to the sheriff's office to be interviewed, while Det. Nolan and other officers stayed and worked the crime scene. Det. Nolan testified that he was point person for the investigation, and the other officers involved were communicating information to him. Processing of the crime scene was completed around 6:00 or 6:30 p.m. By that time another detective, who was at the sheriff's office taking statements, had informed him that the defendant had told the witness that he had killed the victim. Det. Nolan testified that no physical evidence was located at the crime scene, but photographs were taken. He further testified that once the crime scene investigation was complete, the body was removed by the Union Parish Coroner's Office and sent to Little Rock, Arkansas, for an autopsy.

Det. Nolan testified that he discovered that the victim lived just a short distance away from the hog pen. Det. Nolan went to the victim's house and spoke with his mother to verify that the victim was her son, Jerry

7

Dean Ramsey.  Det. Nolan identified a land map of the area of Tiger Bend and King Johnson Roads.[5]  Det. Nolan also identified on the map approximate locations of where the victim's body had been found, the defendant's home, and the pond in which the weapon was subsequently found.

Det. Nolan further identified a previously admitted photograph as depicting what he saw at the scene when he came upon the decedent.  Det. Nolan identified additional photos of the scene taken by him from different angles and distances.  Det. Nolan pointed out that the photos showed the way in which the decedent was found, with his right pants pocket pulled inside out.  Det. Nolan stated that there was no jewelry found in the victim's pockets,[6] and noted that any items found were not removed by officers, but were sent with the body to Little Rock.

The state next had Det. Nolan explain for the jury several other photographs he had taken of the scene, including two of the pipeline near the decedent's body, one of the victim's body showing the pocket pulled "inside out" on the right side of his pants, and several depicting the wound on the victim's body.  One of these photos was of the blood-soaked area where the victim was found, which confirmed that the victim was on his back when he fell after he was shot, and that his body had not been moved.  Det. Nolan next displayed and explained photographs of the gunshot wound through the

---

[5] The map was introduced into evidence and displayed to the jury.

[6] During his statement to Det. Nolan, the defendant made a comment about the victim having "diamonds."  Det. Nolan learned from the victim's mother that a necklace with small diamond "pieces" was a prized possession of her son's; this necklace was never found after the victim's death.

back area of the victim's shirt, and testified that it was determined that a 12-gauge shotgun fired from close range caused the victim's death.

Det. Nolan testified that during the February 15, 2018, interview, the defendant stated that the shotgun he used was disassembled into three pieces—stock, barrel, and a quarter-sized screw that held the other two pieces together—then thrown into a pond off King Johnson Road behind the residence of C.W. Wheeler. The next day, February 16, 2018, the pond was searched using a magnet and rakes. Photographs taken by Det. Nolan of this process were admitted into evidence. Det. Nolan explained that the photographs depicted the officers combing for, then removing from the pond, the shotgun stock and barrel, both of which were a part of a Remington 12-gauge Model 870 Express Super Magnum. Det. Nolan testified that the defendant was at the pond to help with the search for the weapon and was there when the gun was recovered. The defendant identified the shotgun stock pulled from the pond as the one recently used by him in Union Parish. Det. Nolan identified the defendant in open court as the person from whom he took a statement, who was arrested for the crime, and who told him where to find the weapon. He also identified the defendant as the person who identified the weapon once it was located. Det. Nolan testified that the gun barrel and the shotgun stock fit one another, and all the markings were consistent.

Det. Nolan next showed the jury photographs he had taken of the pond behind the Wheeler residence. Det. Nolan identified where the defendant was actually standing when he threw the gun into the pond. The state reminded the jury of the juxtaposition of the locations of the pond, the defendant's residence, and the place where the victim's body was found by

having Det. Nolan show, then mark these spots on the map previously entered into evidence.

Det. Nolan testified that photographs were taken of the defendant, specifically his right shoulder. Det. Nolan explained that when a person is shooting a shotgun or rifle, if the butt of the gun is not secured and pressed into the shoulder, there will often be a recoil or "kick" mark. Det. Nolan testified that there was such a mark or bruise on the defendant's right shoulder consistent with a recoil caused by either a shotgun or rifle. Det. Nolan showed the jury a photograph taken by him of the defendant depicting the bruise or recoil mark.[7] Det. Nolan testified that during the defendant's statement, the defendant admitted to him that the mark was recoil from the shotgun. Det. Nolan further testified that during his statement, the defendant related that the victim had been armed with a Winchester .22 Magnum rifle and a flashlight which the defendant took back to the victim's house and put in his bedroom during the early morning hours. Det. Nolan testified that when officers went to the victim's house, they found the Winchester .22 Magnum rifle and a flashlight as described to Det. Nolan by the defendant during his statement. Det. Nolan identified the flashlight and the Winchester .22 Magnum rifle retrieved from the victim's bedroom.[8]

Det. Nolan testified that officers found the defendant at his sister's residence on Tiger Bend Road and arrested him. When the defendant was taken into custody, he voluntarily gave officers his backpack, which

---

[7] This photograph was entered into evidence.

[8] These exhibits were admitted into evidence and displayed to the jury.

10

contained clothing, his wallet, and a flashlight.[9]  Det. Nolan related that the defendant told him, during his statement, that he was planning to leave the parish.

Det. Nolan testified that the defendant voluntarily gave his statement on February 15, 2018, a little after 9:00 p.m.  Det. Nolan identified the "Explanation of *Miranda* Rights Form" that was read to the defendant prior to his statement.  Det. Nolan noted that the defendant was also allowed to read the advice of rights form himself.  Det. Nolan testified that the form was signed by the defendant, himself, and Sgt. Mike Bryan, another officer present during the statement made by the defendant.[10]  Det. Nolan testified that the defendant provided information in his statement that was unknown at that time to officers, but that they were able to verify, such as the location of the murder weapon and the fact that the defendant had returned the victim's rifle and flashlight to the home the victim shared with his mother.  Det. Nolan also testified that the defendant stated that he had filled a shotgun shell with sand so it would sink, and had thrown it into the pond.  Det. Nolan testified that the shell was not found, either near the body or in the shotgun barrel recovered from the pond.

Det. Nolan testified that the defendant's statement was recorded, a copy was provided to the District Attorney's Office, and the statement was subsequently transcribed.[11]  A copy of the transcribed statement was provided to jurors, while the recorded statement was played in open court.

---

[9] The backpack and its contents were admitted into evidence and displayed to the jury.

[10] The form was introduced into evidence, and a copy was provided to the jury.

[11] The recorded statement and a copy of the transcript were entered into evidence.

11

Det. Nolan was asked about a statement by the defendant that, once he was dropped off outside of Bernice by Spencer, a man named Brian Foster picked him up on Highway 167 near the town of Dubach and brought the defendant back to his house. Det. Nolan also testified that a statement had been taken from Foster which confirmed the defendant's statement. Det. Nolan noted that Foster, however, had committed suicide and was unable to testify in court.

Det. Nolan testified that during the defendant's statement, he admitted that the victim had never pointed his gun at him, he did not try to help the victim after he shot him, and he did not return to the scene to help the victim. Det. Nolan testified that the defendant said that he took the flashlight out of the victim's pocket, which is why the pocket was inside out when the victim's body was found. Det. Nolan testified that the defendant related that, when he walked into the victim's house that night before they went to the hog pen, the victim was trying to hide his "diamonds." According to Det. Nolan, although the jewelry was mentioned, nothing was found either at the victim's home, the defendant's home, or in the defendant's backpack.

Det. Nolan testified that while surveying the scene, he found two different footprints, and there were tire tracks going to the top of the hill, but none going down the line to where the victim's body was found. Det. Nolan testified that the defendant appeared to be fairly willing and cooperative when giving his statement, and much of the defendant's statement corresponded with evidence later recovered. Det. Nolan testified that during his statement, the defendant told him that as a kid he stole from the victim, but they did not have any recent problems. According to Det. Nolan, the

12

defendant stated that he had "smoked meth, popped pills, and drank" with the victim in the past. The defendant told him that when he first knocked on the door on February 14, 2018, the victim opened the door and "he was rambling." Det. Nolan testified that he did not believe the defendant set out that night to do anything to harm the victim, but after the defendant pulled the trigger he panicked and while he initially tried to run away, he later decided to return to the scene.

On redirect, Det. Nolan testified that, based on the location of the gunshot wound, it appeared that the defendant shot the victim in his back. Det. Nolan further testified that the diamond jewelry that was mentioned was never recovered, and the only reason the victim was "out there," in that position worried about somebody stealing his jewelry, was because the defendant set the victim up.

The state's next witness was Ruth Johnston, the victim's aunt. Ms. Johnston testified that she has known the victim since he was a child, approximately 43 years. Ms. Johnston stated that the victim could build anything, and would come to her house and help her husband with construction projects. Ms. Johnston stated that while planning the victim's funeral, his mother, Joanne Johnston Ramsey, suffered three major strokes and was currently in a rehabilitative nursing facility, having been in either a hospital or nursing facility since a week after her son's death. Ms. Johnston stated that the victim's mother does not have any recollection of what happened at the time of her son's death, which is why she was unable to testify at trial. Ms. Johnston testified that the victim did carpentry work, but had worked in the oilfield until he was injured on the job. Ms. Johnston testified that she was not aware of the victim using any illegal drugs, but was

13

familiar with a piece of jewelry given to him by his mother. Ms. Johnston described the jewelry as something the victim's mother had gotten from a thrift or pawn shop that had little diamond bits in it. According to Ms. Johnston, the jewelry had more sentimental than actual monetary value because it was a gift from the victim's mother. Ms. Johnston stated that the victim would refer to it as diamond jewelry and carried it around in his pocket all the time. Ms. Johnston testified that no one knows where the jewelry is now, although people have looked for it. According to Ms. Johnston, the victim would never have contemplated a friend trying to steal his jewelry. She further testified that, "If you try and steal my jewelry, I'm gonna kill you," does not sound like something the victim would have said. Ms. Johnston also testified that one of the things the victim's mother stated was that she would have never thought the defendant was capable of such a thing. Ms. Johnston further explained that if "you were [Ramsey's] friend, there was no mountain, nothing he wouldn't do . . . If you weren't his friend, then he just didn't fool with you."

On cross-examination, Ms. Johnston testified that she has met many of the victim's friends, but does not recall whether or not she met the defendant. Ms. Johnston further testified that she was not aware of any problems between the victim and the defendant.

Dr. Frank Peretti, associate medical examiner at the Arkansas State Crime Laboratory, and an expert in the field of forensic pathology, testified as the state's next witness. Dr. Peretti stated that he performed an autopsy

14

on the victim's body on February 17, 2018.[12]  Dr. Peretti testified that the victim died as a result of a single gunshot wound to the back.  Dr. Peretti explained that the plastic shotgun shell is the outer container that holds the wadding, cupping, and pellets, and that when a shotgun is fired, it ejects the pellets along with the cupping and wadding.  All of these, the wadding, cupping, and pellets, were recovered from inside the wound on the victim's right upper back.  Dr. Peretti testified that because the wadding and cupping were inside the wound, he could tell that the gun was less than three feet from the victim's body when it was fired.  Dr. Peretti testified that the manner of death was classified as a homicide.  Dr. Peretti stated that the pellets went in and predominantly involved the fourth through seventh ribs in the back and the middle and lower lobes of the victim's right lung.  Dr. Peretti testified that the victim did not survive long following the gunshot.  Dr. Peretti stated that alcohol was found in the victim's body post-mortem and hydrocodone was found in his urine, but not in his blood.  According to Dr. Peretti, the significance of the presence of hydrocodone in the victim's urine rather than his blood meant that the usage was not recent.

On cross-examination, Dr. Peretti confirmed that the cause of death was a shotgun wound, but testified that it isn't possible to tell the angle of a shot just from the body of the decedent.  Dr. Peretti confirmed that the estimated distance was probably less than three feet, and the level of alcohol found is from post-mortem decomposition.  Dr. Peretti stated that the

---

[12] The autopsy report and an attached toxicology report were identified by Dr. Peretti as having been produced by his office after they autopsied the victim, and the reports were introduced into evidence.

hydrocodone in the victim's urine could possibly indicate usage 24 hours prior to his death.

Following Dr. Peretti's testimony, the state rested and the defense called its first witness.

Tonya Zeigler, the defendant's older sister and a distant cousin of the victim, testified that her brother and the victim had a "weird" relationship. When they were younger, the victim did not like the defendant, and the defendant was scared of the victim, who threatened to kill the defendant. As the defendant got older, the victim started to spend a little more time with him. Ms. Zeigler testified that years ago, the defendant was accused of stealing a motorcycle or something like that from the victim. Ms. Zeigler testified that she was in contact with the defendant the week before the victim's death, and at no time did the defendant mention that he was having any trouble with the victim.

On cross-examination, Ms. Zeigler testified that she had talked with the defendant about the victim's death and asked him whether he shot the victim. Ms. Zeigler testified that her brother's response was, "Tonya, I wouldn't do that. That's murder." Ms. Zeigler stated that she had this conversation with the defendant on February 15, 2018, before the police arrived.

The defense's next witness was Leanne Zeigler, Tonya Zeigler's daughter. Leanne testified that she was not aware of any problems between the defendant and the victim prior to his death. Leanne stated that when the defendant was younger, the victim would "always" threaten to kill the defendant because the defendant would steal from him. Leanne testified that not long after the victim's death, she and her fiancé were asked to pick up

the defendant. Leanne could not remember who called them to do so, but she thinks that she picked the defendant up by a bridge in Dubach. Leanne stated that they brought him back to Tiger Bend Road, but he did not mention what had happened.

On cross-examination, Leanne testified that she did not recall the time of day it was when she and her fiancé picked up the defendant, but it was the same day that the defendant was arrested. Leanne described the defendant as calm and quiet during the ride, just looking out the window as they drove. Leanne stated that she and the victim were close; she would go see him in the afternoons sometimes, and he would treat people well. Leanne testified that when she and her fiancé picked up the defendant, she was unaware that the police were looking for him. It was not until later, while at a friend's house, that she became aware of the situation.

Defense counsel recalled Det. Nolan, who testified that during the defendant's statement, he mentioned a diamond necklace a few times, but never said that he tried to take it, or that he removed it from the victim's pocket. Det. Nolan reiterated his previous testimony that, during the defendant's statement, he said he feared that if he turned his back on the victim, he would shoot him, and that on the defendant's right shoulder there was a mark consistent with recoil caused by either a shotgun or rifle. Det. Nolan testified that he found the defendant to be very cooperative and at no point during the conversation did the defendant indicate that he had any intent to harm or injure the victim going into that evening.

Det. Nolan testified that during the defendant's statement, he related that when he walked into the victim's house, the victim was trying to hide his diamonds because he thought that someone was trying to steal them.

17

Det. Nolan clarified that the diamonds in question were in fact diamonds in a necklace. Det. Nolan testified that it would be common sense to put an item in one's pocket if that person believed that someone was trying to steal it from them and the person was leaving one's residence. Det. Nolan further testified that the defendant had time to formulate a story of justifiable homicide for his defense. Det. Nolan testified that there was no necessity to take human life; the shooter had time to retreat; the gunshot wound was in the victim's back, and, since it was dark in the woods, it would be hard to shoot at anyone.

On redirect, Det. Nolan again testified that the defendant stated that the evening of the shooting, the victim was acting in a strange way that the defendant was not used to seeing, and the defendant said he feared turning his back on the victim.

The final witness called by the defense was Lorene Bridges, the defendant's mother; she is also the victim's cousin. Mrs. Bridges testified that when the defendant was young, he would not go around the victim, but as the defendant got a little older, he would go around the victim more, to the point where the victim started to like the defendant. Mrs. Bridges testified that they were not best friends, but they got along in later years. Mrs. Bridges stated that in the short time before the victim's death, she was not aware of any problems between the defendant and the victim, and the defendant never said anything that would lead her to believe he wanted to hurt the victim.

On cross-examination, Mrs. Bridges testified that the defendant has always been afraid of the victim, and the victim "always" wore a pistol on his side. Mrs. Bridges testified that when the defendant was five or six years

old, he and one of his older cousins stole the victim's motorcycle. Mrs. Bridges stated that she does not know what happened the night that the victim was shot.

Following Mrs. Bridges' testimony, the defense rested, and closing arguments were made. The jury was charged and after deliberations, the jury returned with a unanimous verdict of guilty as charged of second degree murder. The matter was set for sentencing and a presentencing investigation ("PSI") report was ordered.

The defendant filed a post-verdict motion for acquittal and motion for new trial, which were denied by the trial court. Subsequently, the trial court sentenced the defendant to the mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation of suspension of sentence.

The defendant has appealed his conviction.

## DISCUSSION

*Sufficiency of the Evidence*

The defendant argues that, viewing the evidence in the light most favorable to the prosecution, the state failed to present sufficient evidence to support the verdict of second degree murder. According to the defendant, his statement was consistent with the evidence presented by the state that Ramsey was holding a .22 Magnum rifle in a way that he could pull the gun up quickly. The defendant asserts that there was no evidence that Ramsey was carrying jewelry, which has never been located. Additionally, the defendant argues that although his statement acknowledges that he shot Ramsey, it does not admit that he did so purposefully. Instead, the defendant urges that in his freely given statement, he stated that he thought Ramsey would shoot or inflict bodily harm upon him. The defendant urges

19

that he was forthcoming and his statement was truthful, and this Court should evaluate the evidence presented to determine whether it was sufficient for a conviction of second degree murder.

The state responds that there is no dispute that the defendant shot and killed the victim; therefore, the state is left to show that sufficient evidence was presented at trial for the jury to conclude that the defendant had the specific intent to kill or inflict great bodily harm upon the victim. The state points to Det. Nolan's testimony regarding the defendant's recorded statement. First, Det. Nolan never testified that the defendant ever stated that the victim pointed the .22 Magnum rifle at him, or that the victim acted like he was going to shoot the defendant. Additionally, the defendant never stated that he went back or tried to help the victim. Det. Nolan further testified that the reason that the defendant and the victim were out that night was because the defendant sought out the victim. The state also argued that the defendant's attorney thoroughly explored the defendant's claim that he was fearful of the victim and shot him out of concern for his own safety.

The state further references Dr. Peretti's testimony. Dr. Peretti, an expert in forensic pathology, testified that the shooter was less than three feet away when the fatal shot was fired; this is supported by the pellets, wadding, and cupping found in the fatal wound by Dr. Peretti during the autopsy. According to the state, the jury heard Det. Nolan's testimony, the defendant's statement, and Dr. Peretti's testimony, as well as the evidence presented by the defendant, and weighed it all before returning its verdict of guilty to the charge of second degree murder. Based on the evidence, the jury was justified in concluding that the defendant had the specific intent to kill or inflict great bodily harm upon the victim.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717*, writ denied*, 16-1479 (La. 5/19/17), 221 So. 3d 78. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Robinson, supra.*

A reviewing court affords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Mitchell*, 50,188 (La. App. 2 Cir. 11/18/15), 181 So. 3d 800*, writ denied*, 15-2356 (La. 1/9/17), 214 So. 3d 863; *State v. Eason*, 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913, *cert. denied*, 561 U.S. 1013, 130 S. Ct. 3472, 177 L. Ed. 2d 1068 (2010).

Louisiana Revised Statute 14:30.1(A)(1) provides that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Subsection (B) of La. R.S. 14:30.1 provides that whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed

21

criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. *State v. Harris*, 52,541 (La. App. 2 Cir. 2/27/19), 266 So. 3d 953, *writ denied*, 19-00611 (La. 9/17/19), 279 So. 3d 380; *State v. Murray*, 49,418 (La. App. 2 Cir. 1/14/15), 161 So. 3d 918, *writ denied*, 15-0379 (La. 4/8/16), 191 So. 3d 582. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434. Specific intent to kill may also be inferred from the extent and severity of the victim's injuries. *State v. Harris, supra*; *State v. Lewis*, 51,672 (La. App. 2 Cir. 11/15/17), 245 So. 3d 233.

The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. *State v. Seals*, 95-0305 (La. 11/25/96), 684 So. 2d 368, *cert. denied*, 520 U.S. 1199, 117 S. Ct. 1558, 137 L. Ed. 2d 705 (1997); *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 17-1894 (La. 6/1/18), 243 So. 3d 1064; *State v. Dooley*, 38,763 (La. App. 2 Cir. 9/22/04), 882 So. 2d 731, *writ denied*, 04-2645 (La. 2/18/05), 896 So. 2d 30.

In the instant case, the defendant does not deny that he shot the victim. His argument is that because he was acting out of fear of the victim, he did not have the requisite specific intent to support a conviction of second degree murder.

The evidence, viewed in a light most favorable to the prosecution, supports the conclusion that the jury could have found the essential elements of second degree murder, including the requisite element of specific intent, proven beyond a reasonable doubt. The state established its case with testimonial and pictorial evidence, letting the jury visualize the events as

they were described, and the statement of the defendant. Det. Nolan summarized the defendant's statement during his testimony, and the defendant's recorded statement was played for the jury.

The defendant told Det. Nolan that he went to the victim's house to let him know that he had seen flashlights out near the hog pen. The defendant further related that the victim was agitated, but the defendant nonetheless joined him in picking up guns and flashlights and taking off for the hog pen. The defendant told Det. Nolan that once the two men got there, upon finding no lights, the victim got upset with the defendant and accused him of setting him up in order to rob him. The defendant told Det. Nolan that he shot the victim before the victim could shoot him. At no time did the defendant tell Det. Nolan that the victim actually tried to use his weapon against the defendant before or at the time that the defendant shot the victim.

The defendant related to both Det. Nolan and his friend Allen Spencer that he shot the victim, broke down the weapon he used, and disposed of the pieces in a nearby pond. Furthermore, the defendant did nothing to aid or assist the victim after he shot him. Instead, in his statement, the defendant said that he went back the next morning to get the rifle carried by the victim and the flashlight out of his pocket to return to the victim's house before his mother could notice they were missing. There is also testimony by several witnesses regarding the defendant's plans and efforts to flee Union Parish the morning after he shot the victim. Through the testimony of Dr. Peretti, who performed the autopsy of the victim, the state established that the defendant shot the victim in the back at a distance of less than three feet.

The totality of the evidence presented was sufficient to establish that the defendant shot the victim with the intent to kill or inflict great bodily

23

harm.  The jury could have reasonably found that the defendant lured the victim (from whom the defendant had previously stolen) out to the woods after dark based on the pretext that the defendant had seen flashlights near the hog pen.  Likewise, the evidence presented by the state is such that the jury could have reasonably rejected the defendant's claim that he acted out of fear or in self-defense.  This assignment of error is without merit.

## CONCLUSION

For the reasons set forth above, the conviction and sentence of the defendant, David Michael Bull, are affirmed.

**AFFIRMED.**